No. 23-1418

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**STATE OF WEST VIRGINIA,**
**Petitioner,**

*v.*

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.**
**Respondents.**

---

## PETITIONER'S OPENING BRIEF

---

PATRICK MORRISEY
*Attorney General*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
lindsay.s.see@wvago.gov

LINDSAY S. SEE
*Solicitor General*
*Counsel of Record*

MICHAEL R. WILLIAMS
*Principal Deputy Solicitor General*

*Counsel for Petitioner State of West Virginia*

Elbert Lin
Kevin S. Elliker
David N. Goldman
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, East Tower
Richmond, VA  23219
(804) 788-8200
elin@HuntonAK.com
kelliker@HuntonAK.com
dgoldman@HuntonAK.com

E. Carter Chandler Clements
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC  20037
(202) 955-1500
eclements@HuntonAK.com

*Special Assistant Attorneys General*

*Counsel for Petitioner*
*State of West Virginia*

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................... i

TABLE OF AUTHORITIES ............................................................. iii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ...................................................3

STATEMENT OF THE ISSUES........................................................4

STATEMENT OF THE CASE............................................................4

  I.   Legal Background.................................................................4

  II.  Procedural History ...............................................................7

    A.  EPA issues guidance and air-quality modeling in 2018 for States to consider in their SIPs. ........................................................7

    B.  West Virginia submits its SIP in 2019. ......................................8

    C.  EPA waits two-and-a-half years to reject West Virginia's SIP based on a new version of modeling...................................................12

    D.  EPA waits another year to finalize its disapproval of the SIP based on yet a *third* version of modeling. ...............................................15

    E.  One month later, EPA issues the FIP......................................16

    F.  This Court stays the disapproval of the West Virginia SIP, and EPA stays the FIP's effective date in West Virginia........................................18

SUMMARY OF THE ARGUMENT .................................................20

STANDARD OF REVIEW ..............................................................26

ARGUMENT ..................................................................................26

  I.   EPA exceeded its authority under the CAA by imposing a presumption of "national uniformity" that the Act does not contain. ...........................................27

    A.  Under the Act's cooperative-federalism design, EPA has a limited role in the SIP process. ........................................................28

    B.  EPA overstepped its limited role by requiring West Virginia to justify any deviation from the Agency's policy preferences. ............................................33

    C.  EPA cannot offer any sound justification for exceeding its statutory authority under the Act.......................................................37

    D.  This Court should require EPA to apply the proper deferential standard of review in the first instance. .................................................39

II.   EPA's use of late-breaking modeling was independently arbitrary and capricious. ...........................................................................................................42

    A.   EPA's reliance on new modeling unavailable to the State departed from longstanding EPA policy and deprived the State of the opportunity and ability to satisfy the Agency's criteria...........................................................................43

    B.   EPA's reliance on evolving modeling data was arbitrary and capricious because the Version 3 modeling was unavailable to EPA by the time the Act required final action on the West Virginia SIP. .................................................49

    C.   EPA's assertion that it should use the best information available is inconsistent with its limited role under the Act. ................................................51

III.   This Court should vacate the disapproval of the West Virginia SIP. ........53

    A.   The APA does not allow remand without vacatur in these circumstances. ....................................................................................................................................53

    B.   Remand without vacatur is inappropriate in this case. .............................55

CONCLUSION ..........................................................................................................56

STATEMENT REGARDING ORAL ARGUMENT ...........................................56

CERTIFICATE OF COMPLIANCE......................................................................58

CERTIFICATE OF SERVICE ...............................................................................59

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Env't Conservation v. EPA*,
    540 U.S. 461 (2004)............................................................*passim*

*Alaska Pro. Hunters Ass'n v. FAA*,
    177 F.3d 1030 (D.C. Cir. 1999)................................................47, 48

*Alden v. Maine*,
    527 U.S. 706 (1999)....................................................................32

*Allied-Signal, Inc. v. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993)....................................................55

*Am. Great Lakes Ports Ass'n v. Schultz*,
    962 F.3d 510 (D.C. Cir. 2020)....................................................55

*Arizona ex rel. Darwin v. EPA*,
    815 F.3d 519 (9th Cir. 2016) ................................................31, 32

*Avail Vapor, LLC v. FDA*,
    55 F.4th 409 (4th Cir. 2022) ......................................................53

*Calcutt v. FDIC*,
    598 U.S. 623 (2023) (per curiam)................................................39

*Califano v. Sanders*,
    420 U.S. 99 (1977)......................................................................54

*Camp v. Pitts*,
    411 U.S. 138 (1973) (per curiam)................................................54

*Caring Hearts Pers. Home Servs., Inc. v. Burwell*,
    824 F.3d 968 (10th Cir. 2016) ....................................................47

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)....................................................................36

*Citizens Against the Refinery's Effects, Inc. v. EPA*,
    643 F.2d 183 (4th Cir. 1981) ......................................................31

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ............................................................... 54

*Comcast Corp. v. FCC*,
    579 F.3d 1 (D.C. Cir. 2009) .......................................... 53, 54

*Danti v. Lewis*,
    312 F.2d 345 (D.C. Cir. 1962) .............................................. 47

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ...................................................... 42, 46

*Env't Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005) .............................................. 43

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) ................................................... *passim*

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................. 46

*Fed. Power Comm'n v. Idaho Power Co.*,
    344 U.S. 17 (1952) ............................................................... 39

*Florida Power & Light Co. v. Costle*,
    650 F.2d 579 (5th Cir. 1981) ............................................... 29

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
    452 U.S. 264 (1981) ............................................................. 36

*In re Clean Water Act Rulemaking*,
    60 F.4th 583 (9th Cir. 2023) ............................................... 54

*Kentucky v. EPA*,
    Nos. 23-3216/3225, 2023 U.S. App. LEXIS 18981 (6th Cir. July
    25, 2023) (order) ................................................... 45, 47, 48

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) ................................................................ 54

*Methodist Hosp. of Sacramento v. Shalala*,
    38 F.3d 1225 (D.C. Cir. 1994) .............................................. 46

*Michigan v. EPA*,
 213 F.3d 663 (D.C. Cir. 2000) (per curiam)................................28, 36

*Mirant Potomac River, LLC v. EPA*,
 577 F.3d 223 (4th Cir. 2009) ...............................................................28

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.
 Ins. Co.*,
 463 U.S. 29 (1983)..........................................................42, 50, 52

*Nat'l Pork Producers Council v. Ross*,
 598 U.S. 356 (2023)................................................................41

*New York v. EPA*,
 964 F.3d 1214 (D.C. Cir. 2020)......................................................48

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
 615 F.3d 291 (4th Cir. 2010) ..............................................5, 6, 51

*North Dakota v. EPA*,
 730 F.3d 750 (8th Cir. 2013) ........................................................31

*Oklahoma v. EPA*,
 723 F.3d 1201 (10th Cir. 2013) ...............................................32, 37

*Perez v. Mortg. Bankers Ass'n*,
 575 U.S. 92 (2015).............................................................47

*SEC v. Chenery Corp.*,
 318 U.S. 80 (1943)..............................................................26, 39

*Sierra Club v. EPA*,
 356 F.3d 296 (D.C. Cir. 2004)...................................................45, 46

*Sierra Club v. U.S. Army Corps of Eng'rs*,
 909 F.3d 635 (4th Cir. 2018) ......................................................53

*South Carolina v. United States*,
 907 F.3d 742 (4th Cir. 2018) ........................................................54

*Sw. Airlines Co. v. FERC*,
 926 F.3d 851 (D.C. Cir. 2019)......................................................46

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ........................................................30, 50

*Texas v. EPA*,
    No. 23-60069, 2023 U.S. App. LEXIS 13898 (5th Cir. May 1,
    2023) (per curiam) ........................................................*passim*

*Train v. Nat. Res. Def. Council, Inc.*,
    421 U.S. 60 (1975) ........................................................*passim*

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976) ........................................................*passim*

*Virginia v. Browner*,
    80 F.3d 869 (4th Cir. 1996) ........................................4, 29, 36, 48

*Virginia v. EPA*,
    108 F.3d 1397 (D.C. Cir.), *decision modified on reh'g*,
    116 F.3d 499 (D.C. Cir. 1997) ........................................................5

*Wages & White Lion Investments, LLC v. FDA*,
    90 F.4th 357 (5th Cir. 2024) (en banc) ........................................42, 47

*West Virginia v. EPA*,
    90 F.4th 323 (4th Cir. 2024) ........................................................19, 55

*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019) (per curiam) ........................................6, 49

*Wyoming v. EPA*,
    78 F.4th 1171 (10th Cir. 2023) ........................................................31, 32

**Statutes**

5 U.S.C. §§

    706........................................................................18, 26, 54

    706(1) ........................................................................54

    706(2) ........................................................................53, 54, 55

    706(2)(A) ........................................................................27, 42

706(2)(C) ................................................................26, 37

42 U.S.C. §§

7401 *et seq.* ..............................................................4

7401(a)(3) ............................................................*passim*

7410 .......................................................................39

7410(a)(1) ...............................................................7

7410(a)(2) ...............................................................38

7410(a)(2)(D)(i) .......................................................5

7410(a)(2)(D)(i)(I) ...................................................36

7410(a)(2)(H)(ii) .....................................................52

7410(c) ....................................................35, 48, 55

7410(c)(1) ...............................................5, 7, 35

7410(k) .....................................................................3

7410(k)(1)(B) ...........................................................9

7410(k)(2) ..........................................7, 12, 49, 50

7410(k)(3) ............................................5, 28, 38

7410(k)(5) ...............................................................51

7475(a)(4) ...............................................................30

7477 ........................................................................30

7479(3) ....................................................................30

7511a(c)(2)(B) ........................................................45

7511a(d) ..................................................................45

7607(b)(1) ...........................................................4, 18

**Regulations**

40 C.F.R. § 50.19 ...................................................................7

**Federal Register**

69 Fed. Reg. 21717 (Apr. 22, 2004) ...........................45, 48, 50

76 Fed. Reg. 48208 (Aug. 8, 2011)......................................6

80 Fed. Reg. 65292 (Oct. 26, 2015) (codified at 40 C.F.R. § 50.19) .......................7

81 Fed. Reg. 59876 (Aug. 31, 2016)............................45, 46

81 Fed. Reg. 74504 (Oct. 26, 2016)...........................7, 36, 56

86 Fed. Reg. 67329 (Nov. 26, 2021)................................45

87 Fed. Reg. 9516 (Feb. 22, 2022) .............................*passim*

87 Fed. Reg. 20036 (Apr. 6, 2022) .................................17

87 Fed. Reg. 68483 (Nov. 15, 2022)............................45, 48

88 Fed. Reg. 9336 (Feb. 13, 2023) .............................*passim*

88 Fed. Reg. 36654 (June 5, 2023) ............................7, 17, 18

88 Fed. Reg. 67102 (Sept. 29, 2023) ...............................19

**Court Rules**

Fed. R. App. P. 18.....................................................18

Fed. R. App. P. 32(a)(5)-(6)........................................58

Fed. R. App. P. 32(a)(7)(B)(i)......................................58

Fed. R. App. P. 32(f).................................................58

**Miscellaneous**

Dwyer, John P., *The Practice of Federalism Under the Clean Air Act*,
54 MD. L. REV. 1183 (1995) .......................................28, 29

Holmes, Oliver W., *Holdsworth's English Law*,
    25 L.Q. REV. 412 (1909) ..................................................................... 47

*Ohio v. EPA*, No. 23-1183 (D.C. Cir. filed July 17, 2023) ...................... 19

*Ohio v. EPA*, No. 23A349 (U.S.) ............................................................ 19

Order, *Alabama ex rel. Att'y Gen., State of Alabama, Ala. Dep't of*
    *Env't Mgmt. v. EPA*,
    No. 23-11173 (11th Cir. Aug. 17, 2023), ECF No. 33-2 ................... 19

Order, *Allete, Inc. v. EPA*,
    No. 23-1776 (8th Cir. July 5, 2023), ECF No. 5292580 ................... 19

Order, *Nevada Cement Co. v. EPA*,
    No. 23-682 (9th Cir. July 3, 2023), ECF No. 27.1 ........................... 19

Order, *Utah v. EPA*,
    No. 23-9509 (10th Cir. July 27, 2023), ECF No. 010110895101 ..... 19

U.S. Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin.,
    *HYSPLIT* https://www.arl.noaa.gov/hysplit/ ..................................... 10

U.S. Env't Protection Agency, *Important Dates: Good Neighbor Plan*
    *NOx Ozone Season Group 3 Trading Program*,
    https://tinyurl.com/bdz5netk ........................................................... 16

# **INTRODUCTION**

Clean air is a national priority, but there is no one-size-fits-all solution to curbing air pollution. Variations in geography, population, industry, and more can require different approaches in different States. What works for South Carolina may not work for Maryland. Through the principle of "cooperative federalism," Congress took a balanced approach to these dynamics in the Clean Air Act. Under the Act, the federal government sets national standards for air quality, but the States carry the burden of diagnosing the issues, devising solutions, and bearing the costs of enforcement. In short, the federal government sets the goal, but the States are responsible for deciding how to reach it.

At the same time, air pollution travels. What goes into the air in Richmond may not stay in Virginia, and conditions in Charlotte may have blown in from across State lines. To address that concern, the Clean Air Act tasks States with restricting in-state emissions that may "significantly contribute" to air-quality problems in other States. This requirement is known as the Act's good-neighbor provision.

In 2023, EPA brushed aside cooperative federalism when it rejected West Virginia's proposed good-neighbor plan for addressing the pollutant ozone. EPA did not just set a goal for States like West Virginia to attain; instead, EPA dictated the singular path that States must follow to achieve it. Upending Congress's intent for States to lead in addressing State-specific problems, EPA announced a

purportedly "nationally consistent approach" applying a presumptive "uniform framework of policy judgments" to State-specific records and judgments. And when West Virginia tried to rely on its own policy judgment—informed by its own State and local circumstances for solutions within its own borders—the Agency dismissed West Virginia's reasons for departing from the newfound presumption as inadequate and rejected its plan. At the same time, EPA took the same "EPA-first" approach in disapproving plans from 19 other States (and partially disapproving submissions from two more). And once EPA found a way to reject West Virginia's plan (and the plans of those many other States), it quickly claimed to have lawfully cleared the way to impose its own *federal* plan on all those States and their residents.

Even if EPA's presumption of uniformity were correct—which it isn't—the Agency relied on faulty reasoning in concluding West Virginia failed to adequately justify a departure from that presumption. EPA repeatedly changed the dataset underlying its analysis and, in doing so, departed without explanation from its own prior practice and policy. It even judged West Virginia's plan based on data that did not exist until *after* the States submitted their plans—all without ever giving West Virginia a chance to meaningfully address that new data. Indeed, the dataset did not exist until well past the Agency's statutory deadline for approving or disapproving the States' plans.

Although EPA's actions present a host of problems, EPA's disapproval of West Virginia's ozone implementation plan must ultimately be set aside for two distinct reasons. *First*, EPA reviewed West Virginia's plan under the wrong legal standard. EPA may only review West Virginia's plan for compliance with the law, giving due deference to the State's analysis and conclusions, not pass judgment on the State's policy decisions. Instead, the Agency reviewed the plan with a thumb on the scale in favor of EPA's preference for nationwide uniformity. *Second*, EPA's reliance on late-breaking modeling data to enforce its presumption of uniformity was arbitrary and capricious under the Administrative Procedure Act. EPA relied on data unavailable to West Virginia when it developed the plan and unavailable to EPA until after the Agency's one-year deadline to approve the plan. Using the surprise modeling was (1) a break from prior agency policy, (2) fundamentally unfair, and (3) outside the factors Congress intended EPA to consider.

This Court should grant the petition for review and set aside EPA's disapproval of West Virginia's State implementation plan.

## JURISDICTIONAL STATEMENT

On February 13, 2023, EPA finalized its disapproval of West Virginia's State implementation plan addressing interstate transport under the 2015 8-hour Ozone National Ambient Air Quality Standards. 88 Fed. Reg. 9336 (Feb. 13, 2023) ("Final Disapproval") (JA513); *see* 42 U.S.C. §7410(k) (giving EPA authority to approve

or disapprove State implementation plans).  Petitioner State of West Virginia timely filed a petition for review on April 14, 2023.  §7607(b)(1).  This Court has jurisdiction pursuant to §7607(b)(1).

## STATEMENT OF THE ISSUES

The Clean Air Act is premised on a system of cooperative federalism in which the federal government announces National Ambient Air Quality Standards and each State devises a State implementation plan ("SIP") for meeting them.  Under the Act, so long as a proposed SIP meets the statutory requirements, EPA "shall approve" it.

1. Did EPA act contrary to the Clean Air Act when, rather than asking whether West Virginia's plan was based on "reasoned analysis," it disapproved West Virginia's good-neighbor SIP because the plan failed to "substantially justify" its departure from EPA's preferred "uniform framework of policy judgments"?

2.  Did EPA act arbitrarily and capriciously when it premised its rejection of West Virginia's 2019 good-neighbor SIP submission based on modeling data that was not announced until 2022 and 2023?

## STATEMENT OF THE CASE

### I.    Legal Background

The Clean Air Act ("CAA" or "the Act"), 42 U.S.C. §§7401 *et seq.*, establishes a system of "'cooperative federalism'" to control air pollution in the United States.  *Virginia v. Browner*, 80 F.3d 869, 883 (4th Cir. 1996) (*Virginia*)

(citation omitted).  As one part of that system, EPA designates the "ends" by setting National Ambient Air Quality Standards ("NAAQS"), and the States determine the "means" by implementing plans to meet them.  *Virginia v. EPA*, 108 F.3d 1397, 1408 (D.C. Cir.) (citation omitted), *decision modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997).  When a State submits its State implementation plan ("SIP") to EPA, the Agency "shall approve" it if the SIP meets the Act's requirements.  §7410(k)(3).  If the SIP does not meet the statutory criteria, and the State does not revise its SIP to address that issue, then EPA "shall promulgate a federal implementation plan" ("FIP").  §7410(c)(1).

This challenge involves the Act's "good neighbor provision."  *See* §7410(a)(2)(D)(i).  Air pollution crosses State lines, and pollutants from an "upwind" State may affect a "downwind" State's ability to "maintain satisfactory air quality."  *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 496 (2014).  The good-neighbor provision thus requires that the State "consider the impact of emissions within the state on the ability of other states to meet NAAQs."  *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 300 (4th Cir. 2010).  In particular, the State's SIP must include "adequate provisions" to prevent in-State emissions that "will … contribute significantly to nonattainment" or "interfere with maintenance" of the NAAQS in another State.  §7410(a)(2)(D)(i).  This requirement "prevents states from essentially exporting most of their emissions to other regions

by strategically positioning sources along an arbitrary border line." *North Carolina*, 615 F.3d at 300.

In recent years, EPA has used a non-binding four-step approach to create its own FIPs under the good-neighbor provision. *See* 76 Fed. Reg. 48208, 48248 (Aug. 8, 2011). First, sites in downwind States projected to have nonattainment or maintenance problems are identified. *Id.* These sites are identified by "'receptors,' devices in each State that measure air quality." *Wisconsin v. EPA*, 938 F.3d 303, 310 (D.C. Cir. 2019) (per curiam). Second, upwind States that contribute to (or are "linked" to) those sites should be determined. 76 Fed. Reg. at 48248. The Agency has suggested that a contribution of 1% of the NAAQS is enough to link an upwind State's emissions to a downwind receptor. *Id.* Third, when a link exists, "upwind 'cost thresholds' delivering effective emission reductions and downwind air quality improvement" should be identified. *Id.* And fourth, "emission reductions available at those cost thresholds [should be required through] state budgets." *Id.*

EPA has made clear that States need not follow this four-step approach in crafting their SIPs and may use other approaches. *E.g.*, Final Disapproval, JA546. "EPA recognizes that states have discretion to develop their own SIP transport submissions and agrees that states are not bound to us[e] the 4-step" approach that "EPA has historically used." *Id.*; *accord, e.g.*, 87 Fed. Reg. 9516, 9529 (Feb. 22, 2022) ("Proposed Disapproval") (JA319). Indeed, EPA's own "analytical

approaches have varied over time due to continued evolution of relevant tools and information, as well as their specific application."  JA249; *see, e.g.*, 88 Fed. Reg. 36654, 36684 (June 5, 2023) (introducing "several enhancements"); 81 Fed. Reg. 74504, 74517 (Oct. 26, 2016) (changing the methodology for identifying nonattainment and maintenance receptors in Step 1 of the analysis).  In all events, the Agency has never codified any version of this four-step approach as mandatory for the States, instead offering it as "a reasonable organization to the analysis."  Final Disapproval, JA515.

## II.    Procedural History

In 2015, EPA revised the NAAQS for ozone, reducing the appropriate level from 0.075 parts per million ("ppm") to 0.070 ppm.  80 Fed. Reg. 65292 (Oct. 26, 2015) (codified at 40 C.F.R. §50.19).  States had three years to submit revised SIPs to address NAAQS attainment, including compliance with the good-neighbor provision.  EPA then had one year to approve or disapprove each SIP and, if necessary, two additional years to promulgate a FIP.  42 U.S.C. §7410(a)(1), (c)(1), (k)(2).

### A.    EPA issues guidance and air-quality modeling in 2018 for States to consider in their SIPs.

Before the SIPs were due, EPA issued memoranda "to assist states' efforts to develop good neighbor SIPs" addressing the 2015 NAAQS.  JA248.  The memoranda reiterated the non-binding four-step approach and confirmed that "states

have flexibility to follow" that approach "or develop alternative" approaches in creating their SIPs, "so long as a state's chosen approach has adequate technical justification and is consistent with the requirements of the CAA."  JA269; *accord* JA249; JA276.  After all, EPA's own "analytical approaches ha[d] varied over time." JA249.  And it followed too that, if a State opted for the four-step approach, "various analytical approaches may be used to assess each step."  JA249.  The key consideration was "the requirements of the CAA."  JA249; JA268; JA276.

In March 2018, EPA provided "air quality modeling data for ozone for the year 2023" ("the initial modeling"), which States could use in formulating good-neighbor SIPs.  JA247, JA249-JA252.  These "newly available contribution modeling results" reflected "EPA's latest analysis" and could be used "to identify potential downwind air quality problems."  JA247-JA249.  Using that modeling, EPA identified "potential nonattainment or maintenance receptors," projected ozone levels at those sites, and calculated each State's projected "contributions" to the ozone levels at those receptors.  JA257-JA266.  EPA explained that States "may consider using this national modeling" and "may supplement th[is] information … with any additional information that they believe is relevant."  JA252.

## B.    West Virginia submits its SIP in 2019.

West Virginia's Department of Environmental Protection ("West Virginia" or "the State") submitted the interstate transport portion of its SIP ("the West Virginia

SIP") in February 2019. JA027. West Virginia held a notice-and-comment period before submitting its SIP, but EPA provided no comments. JA246 (listing participants in the public-comment period). Six months after the submission, West Virginia's SIP was deemed administratively and technically complete by operation of law on August 4, 2019. 42 U.S.C. §7410(k)(1)(B).

West Virginia used EPA's four-step approach to organize its SIP analysis. JA063-JA092. Along the way, the State followed many suggestions from EPA's prior memoranda for a more holistic analysis. *See* JA254.

At Step 1, the State analyzed modeling data from three sources, all using 2011 as the base year (*i.e.*, using 2011 emissions as the input): EPA, Alpine Geophysics, LLC, and the Lake Michigan Air Directors Consortium. JA048, JA051-JA055; *see* JA255 (suggesting "[c]onsideration of model performance"). Though all three models reflected "remarkably comparable impacts" at downwind receptors, JA325, West Virginia concluded that Alpine's modeling was "the most appropriate, robust modeling available." JA055.

At Step 2, West Virginia noted that the Alpine modeling projected the State would be "'linked'" (*i.e.*, contribute more than 1% of the NAAQS) to four downwind receptors in 2023: Harford County, Maryland (near Baltimore); Gloucester, New Jersey (near Philadelphia); Philadelphia, Pennsylvania; and Richmond County, New York (Staten Island). JA055-JA056. Consistent with suggestions from EPA's

memoranda, the State considered additional evidence to determine whether the modeling overstated, understated, or accurately reflected West Virginia's connection to those receptors. *See* JA056-JA063; *see also* JA256 (EPA guidance suggesting an evaluation of "collective contribution").

For example, the State looked at "downwind air quality context"—the circumstances of the surrounding area—and considered the role of local emissions near the receptors. *See* JA255 (EPA guidance). Using data from EPA, West Virginia first compared the ozone concentrations at geographically close receptors because differences between geographically close receptors indicate that concentrations are powerfully influenced by local contributions. It then identified any outsized role of mobile sources (*i.e.*, vehicles, engines, and equipment) in local $NO_x$ emissions.[1] And it noted the population densities near the receptors. JA217-JA220, JA227-JA229, JA238-JA240. Through that detailed analysis, the State found that the receptors' high ozone levels largely resulted from local emissions and local mobile sources— hardly an unreasonable conclusion given that each receptor fell along the Interstate 95 corridor between Baltimore and New York. JA059-JA062.

Wind back-trajectories—which "determine the origin of air masses and establish source-receptor relationships"[2]—told the same story. West Virginia traced

---

[1] Nitrogen oxides ("$NO_x$") are a precursor to ozone formulation.
[2] U.S. Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin., *HYSPLIT* https://www.arl.noaa.gov/hysplit/ (last visited June 3, 2024).

the paths of high-$NO_x$ air parcels arriving at the linked receptors over a two-year period at the times each receptor exceeded the NAAQS. The analysis confirmed that high ozone levels came mainly from urban centers and highways near the receptors, with only a small link to West Virginia. JA057-JA059; JA221-JA224, JA230-JA232, JA241-JA244. The State calculated its relative addition to each receptor's ozone levels fell between 1.02% and 3.5%. JA224, JA234, JA243.

This analysis suggested that the Alpine modeling may have overstated West Virginia's linkages to the identified receptors. Even so, the State continued to Step 3 and considered cost-effective controls for the top six $NO_x$ source categories, which accounted for 95% of total emissions sources in 2017. Electric generating units ("EGUs")—which the State called "Fuel Combustion Electric Utility"—represented the largest category. JA066. After considering available emission reductions from its EGUs, the State concluded that "all identified highly cost-effective emission reductions have already been implemented." JA072. The State also observed that the modeling data likely overstated West Virginia's EGU emissions because six coal-fired power plants appearing in the data had retired since the 2011 base year. JA069. For petroleum-related industries—the second-largest category—the State concluded that its existing permitting programs for construction and modification of major sources were already "more stringent" than similar requirements under federal law. JA066-JA067. The next two categories—"Industrial" and "Other"—were

similar to EGUs; ten facilities had shut down since 2011 and five more were scheduled to do so by 2021, so the State expected significant decreases in $NO_x$ emissions to result. In addition, as with EGUs, the State concluded that all cost-effective controls in these categories had been implemented. JA072-JA074. The last two categories—Highway Vehicles and Off-Highway—related to mobile emissions that are regulated at the federal, not State, level. JA067.

At Step 4, West Virginia described existing State permitting programs, regulations, and performance standards that implement and enforce all control measures that EPA had promulgated in the past. The State concluded these efforts represented all highly cost-effective measures. JA082-JA092. The State elaborated on how other existing and new State regulations ensured that no new or modified sources would contribute to a downwind State's violation of the NAAQS. JA078-JA082. As a result, the State concluded that "no additional cost-effective reductions are available for the 2015 ozone NAAQS." JA092.

### C. EPA waits two-and-a-half years to reject West Virginia's SIP based on a new version of modeling.

After West Virginia's SIP was deemed complete on August 4, 2019, EPA had by statute one year to act on the submittal. 42 U.S.C. §7410(k)(2). EPA instead waited over two-and-half years before proposing to disapprove the SIP on February 22, 2022. That belated proposed disapproval was "based on both newer, updated modeling performed by the EPA that was not available when [West Virginia]

submitted its SIP submission … and the EPA's evaluation of [West Virginia's] SIP submission using the 4-step interstate transport framework." Proposed Disapproval, JA314.

In the Proposed Disapproval, EPA announced for the first time that it would rely on new modeling ("the Version 2 modeling"). *Id.* Unlike EPA's initial modeling (and the Alpine modeling), the Version 2 modeling used 2016 as a base year, meaning that it used different inputs to project 2023 ozone values. JA309. The Agency declared the Alpine modeling "out of date" and explained that it was "*primarily* relying upon the [Version 2] modeling … to inform its decision." JA315-JA316 (emphasis added). And the Version 2 modeling linked West Virginia to four receptors—none of which had been identified in the Alpine modeling and only two of which had been identified in EPA's initial modeling. *Compare* JA315, *with* JA313, *with* JA262 (EPA guidance).[3]

EPA then explained its disagreements with West Virginia's SIP, which centered largely on the Agency's preferred approach and new data. For example, EPA took issue with how State experts analyzed wind back-trajectories, preferring its own use of "updated, photochemical grid modeling." Proposed Disapproval,

---

[3] The new receptors identified in the Version 2 modeling included one receptor near Philadelphia and three receptors in the tri-state region of Connecticut, all located along the I-95 corridor in densely populated areas. Proposed Disapproval, JA315.

JA316.  As for the downwind air-quality context (*i.e.*, the role of local emissions near the receptors), the Agency downplayed the significant impact of local emissions as "neither surprising nor outcome determinative."  *Id.*  Instead, EPA explained, its "4-step process" is the better way to assess the statutory requirement of significant contribution, "start[ing] at the question of whether the state's emissions have a projected impact above the 1 percent of the NAAQS threshold."  *Id.*  And EPA disputed the effect of shutting down various West Virginia power plants.  According to the Agency, the *new* Version 2 modeling accounted for shutdowns but still projected that West Virginia would contribute more than 1% of the NAAQS to various receptors.  JA319.  EPA thus concluded that the West Virginia SIP "fails to contain the necessary provisions" to satisfy the good-neighbor provision.  JA322.

The State responded by submitting comments to EPA on the belated proposed disapproval.  West Virginia explained that its SIP "contained all 'necessary provisions' as were then currently required by EPA" "at the time" the State submitted the SIP.  JA324-JA325.  In the three years between the SIP submission and the Agency's untimely review, "EPA reevaluated and modified without communication to states what it considers as acceptable 'necessary provisions.'"  JA325.  West Virginia protested that "it is impossible for states to predict, much less meet, SIP requirements which are in constant fluctuation."  JA325.  Other

14

commenters also raised objections to numerous aspects of the Proposed Disapproval and EPA's analysis therein.  *See, e.g.*, JA327-JA386.

**D.** **EPA waits another year to finalize its disapproval of the SIP based on yet a *third* version of modeling.**

On February 13, 2023, EPA issued its final disapproval of West Virginia's SIP (and SIPs from 18 other States) by applying a presumption of nationwide uniformity.  *See* Final Disapproval, JA513.  Indeed, EPA emphasized that, through this "consolidated, single final action" addressing SIPs from roughly 20 States "located across a wide geographic area," the Agency would rely on "uniform, nationwide … policy judgments."  JA514, JA557.  Even as EPA claimed tolerance for "methodological variation," it emphasized that, in its view, State responses to their good-neighbor obligations require "a nationally consistent approach" to reach "[e]ffective policy solutions."  JA515-JA517.  That requires EPA to apply "a uniform framework of policy judgments to ensure an 'efficient and equitable' approach" across the country regardless of differences in State facts and circumstances.  JA517 (quoting *EME Homer*, 572 U.S. at 519).  That uniform framework included following EPA's four-step approach and, at each step, reaching the same conclusions and solutions as would EPA.  If any State wished to "deviat[e] from" EPA's "uniform…policy judgments," that deviation must be "substantially justified and have a well-documented technical basis."  *Id.*

EPA also unveiled yet more new and "updated … modeling" ("the Version 3 modeling"), which played "a critical role" in the final determination that West Virginia failed to justify departing from EPA's presumption of uniformity.  JA520. This Version 3 modeling linked West Virginia to a *third* set of downwind receptors: two receptors from the initial and Version 2 modeling and two not identified in any prior modeling (including Alpine's).  JA509 (EPA support document), *with* Proposed Disapproval, JA315, *with* JA055 (SIP), *with* JA262 (EPA guidance).[4] EPA justified its use of updated modeling by claiming the power to use all up-to-date data; it dismissively remarked that States were not "prevented … from submitting new SIP submissions based on that modeling."  Final Disapproval, JA541.  Parroting the Proposed Disapproval, EPA reiterated that West Virginia's plant shutdowns had less impact than the State predicted, as "confirmed" by the Version 2 modeling.  JA537.  The Agency also criticized the West Virginia SIP for failing to "conduct an adequate Step 3 analysis" or "include[] [any] permanent and enforceable emissions controls" under Step 4.  *Id.*

E.     **One month later, EPA issues the FIP.**

In stark contrast to EPA's delay in disapproving the West Virginia SIP, the Agency took only about a month to issue a FIP.  EPA, *Important Dates:  Good*

---

[4] The receptors identified in the Version 3 modeling were all located in the tri-state region of Connecticut along I-95.  JA509.

*Neighbor Plan NOx Ozone Season Group 3 Trading Program*, https://tinyurl.com/bdz5netk (last visited June 3, 2024) (noting that the FIP was finalized and signed on March 15, 2023, though published on June 5, 2023). Indeed, more than 10 months before the Agency had even finalized the SIP disapprovals, it had already proposed a federal control plan. 87 Fed. Reg. 20036 (Apr. 6, 2022). EPA's finalized FIP covers 23 States, including West Virginia, and took effect August 4, 2023, 88 Fed. Reg. at 36654, before being subsequently stayed, *see* p. 19, *infra*.

Unlike the SIPs submitted by West Virginia and other States, which are tailored to address the emission sources and circumstances specific to a State, the FIP does not target emission-reduction requirements for specific ambient impacts originating from any particular source or State. Instead, it creates a new ozone-season regional trading program for EGUs that applies uniformly across 22 of the 23 covered States. The FIP imposes stringent ozone-season budgets for $NO_x$ emissions from EGUs in those States. *See* 88 Fed. Reg. at 36657. EPA established the 2023 budgets based on optimization of already-installed emission-control equipment. But it established much lower emissions budgets for 2026 and later by assuming that new technology can be installed across the 22 States by that time. *Id.* at 36657, 36660. Because it takes years to design and install this equipment, EPA urged EGU owners to act "now" to meet the 2026 budgets. 87 Fed. Reg. at 20101.

In addition to its EGU components, the FIP also imposes specific emissions reductions on several new stationary sources (referred to as "non-EGUs") for the first time in decades with respect to the Act's good-neighbor provision.  *See* 88 Fed. Reg. at 36654, 36681.

### F.     This Court stays the disapproval of the West Virginia SIP, and EPA stays the FIP's effective date in West Virginia.

West Virginia filed a timely petition for review of the Final Disapproval on April 14, 2023, and moved this Court to stay the Final Disapproval pending this Court's consideration of the merits.  ECF Nos. 3, 23.  *See* 42 U.S.C. §7607(b)(1); Fed. R. App. P. 18.  The State argued, among other things, that it was likely to succeed in demonstrating that EPA's disapproval of the West Virginia SIP was in violation of the Act as well as arbitrary and capricious.  *See* 5 U.S.C. §706.  The State explained that EPA's standard for reviewing the SIP—applying the presumption that SIPs must follow the EPA's nationally "uniform" approach and "substantially justif[y]" any deviation from the Agency's policy judgments for implementing the good-neighbor provision—cannot be squared with the Act's text. Further, EPA's reliance on modeling data in enforcing that presumption was arbitrary and capricious in at least two ways:  that data was unavailable to the State when it was charged with preparing the SIP and unavailable to the Agency until the Agency blew past its statutory deadline to act on the SIP.

This Court issued an administrative stay of the Final Disapproval pending oral argument. ECF No.39. On September 29, 2023, EPA responded to this Court's administrative stay order (and similar orders from the Eighth, Ninth, Tenth, and Eleventh Circuits) by staying the effective date of the FIP "for emissions sources" in those States for which a court had stayed EPA's SIP disapproval, recognizing that it cannot impose a FIP without a valid SIP disapproval. 88 Fed. Reg. 67102.[5]

Following oral argument, this Court granted West Virginia's motion and stayed EPA's Final Disapproval. *West Virginia v. EPA*, 90 F.4th 323, 332 (4th Cir. 2024).[6] The FIP "will not" take effect in West Virginia while this Court's stay of the Final Disapproval "remains in place." 88 Fed. Reg. at 67103, 67105.[7]

---

[5] *See* Order, *Allete, Inc. v. EPA*, No.23-1776 (8th Cir. July 5, 2023), ECF 5292580 (Minnesota); Order, *Nevada Cement Co. v. EPA*, No.23-682 (9th Cir. July 3, 2023), ECF 27.1 (Nevada); Order, *Utah v. EPA*, No.23-9509 (10th Cir. July 27, 2023), ECF 010110895101 (Utah, Oklahoma); Order, *Alabama ex rel., Att'y Gen. v. EPA*, No.23-11173 (11th Cir. Aug. 17, 2023), ECF 33-2.

[6] In the same decision, this Court denied EPA's motion to transfer or dismiss the petition for review for improper venue, finding the Fourth Circuit the appropriate venue for West Virginia's challenge to the SIP disapproval. 90 F.4th at 332.

[7] In separate litigation, West Virginia has filed a joint petition for review of the FIP (on its own merits, separate and apart from the SIP disapproval) with Ohio and Indiana in the D.C. Circuit. *See Ohio v. EPA*, No.23-1183 (D.C. Cir. filed July 17, 2023). The Supreme Court heard oral argument on the States' application for a stay of the FIP during that challenge on February 21, 2024. *See Ohio v. EPA*, No.23A349 (U.S.).

**I.** EPA's Final Disapproval violates the Clean Air Act. The Agency overstepped its role under the Act by applying the wrong standard in reviewing West Virginia's SIP. Rather than applying a deferential review for reasonableness, the Agency turned the Act's cooperative-federalism regime on its head and unlawfully imposed a presumption of nationwide uniformity.

**A.** Congress gave EPA a limited role in the SIP process—a "secondary" one in the Supreme Court's words. Once the Agency establishes the NAAQS, the States exercise primary responsibility for assuring that air quality within their borders meets the NAAQS. EPA may only confirm a SIP's compliance with the Act's requirements. To make that confirmation, EPA is restricted to the statutory text. And as the Supreme Court has inferred from the Act's structure, EPA must defer to the State's chosen methods of meeting its CAA obligations. So long as the State's conclusions are based on reasoned analysis, EPA has no choice but to approve the SIP.

**B.** In the Final Disapproval, EPA infringed on West Virginia's authority by insisting that its SIP adhere to the Agency's preference for uniformity. Congress did not demand in the statute a lockstep compliance with a uniform good-neighbor policy. Indeed, EPA's own practice underscores that its approach is nonbinding and

flexible. The Agency's only job in evaluating the West Virginia SIP was to ensure that the submission complied with the Act.

Yet rather than confirm West Virginia's compliance with the Act, the Agency sought to enforce a "nationally consistent approach" of its own making through a "uniform framework of policy judgments." That framework included not only adhering to EPA's non-binding four-step approach, but also reaching the same conclusions at each step as EPA would have reached. Moreover, EPA required that "deviation[s] from" its preferred "nationally consistent approach" must be "substantially justified." The Agency concluded West Virginia had not fallen in line with this nationalized framework and decided the State's justifications for its state-specific judgments were not sufficiently "substantial." So EPA disapproved the SIP.

EPA exceeded its authority. The Supreme Court has made clear that the Agency's policy preferences are subordinate to the State's discretion to design a SIP that complies with the Act. By imposing a "uniform framework of policy judgments," EPA made itself the national good-neighbor policymaker rather than sticking to its obligation to review the State's SIP, and the State-level policy choices contained therein, for compliance with the Act. Moreover, EPA's preferred policy of "national uniformity" is anathema to the Act's cooperative-federalism structure, which favors State-specific solutions over a top-down national framework.

**C.** EPA's defenses in the Final Disapproval fall flat. EPA principally justifies its approach as a "reasonable" implementation of the good-neighbor provision. But that is beside the point. The only relevant question is whether *West Virginia* acted reasonably and in compliance with the plain text of the Act in conducting its own analysis. EPA also attempts to carve out of the Act's cooperative-federalism design an exception for interstate ozone emissions, which the Agency claims are uniquely in need of top-down federal regulation. The text provides no such carveout.

**D.** Once this Court identifies EPA's legal error in this case, that is the end of the matter. Agency action may be upheld in court, if at all, only on the same grounds that the agency offered during the rulemaking process. Because EPA did not accord West Virginia proper deference in reviewing the SIP and instead foisted its own policy preferences on the State, the proper course here is a remand. This Court cannot evaluate the SIP in the first instance.

Even so, the record demonstrates that EPA would have been required to approve the West Virginia SIP if it had applied the appropriate legal standard. The State provided reasoned decision-making at every step of its analysis. It compared multiple modeling sets to determine the best data. West Virginia relied on a multitude of tools, including wind back-trajectories and downwind air quality context, to assess whether the "linkages" identified in the modeling between the State and downwind receptors were accurate. Even though this analysis

demonstrated that the State *did not* contribute significantly to the identified downwind receptors, West Virginia looked at possible cost-effective controls. Based on existing controls and recent developments on the ground not accounted for in the modeling, West Virginia reasonably concluded that there were no further cost-effective controls available.

**II.** The Final Disapproval is unlawful for the independent reason that EPA acted arbitrarily and capriciously by changing the modeling data against which the Agency would measure the West Virginia SIP. Even if EPA's presumption of national uniformity were lawful, EPA's reliance on late-breaking modeling data in enforcing that presumption was arbitrary and capricious for three reasons. The first two reasons stem from the fact that the modeling post-dated the West Virginia SIP submission. First, in using this literally new-found data, EPA departed without explanation from its prior practice of considering only data available to a State at the time of its SIP submission. Second, use of this data was fundamentally unfair for the obvious reason that the State's SIP could not have accounted for data that did not even exist until *years* after its submission. Third, the modeling data arose after EPA's statutory deadline to act on the West Virginia SIP and thus was not a factor Congress intended EPA to consider. Each reason is sufficient to show arbitrary and capricious decision-making.

**A.** EPA's reliance on new modeling deprived the State of the opportunity and ability to satisfy the Agency's criteria. That switcheroo flew in the face of EPA's own recognition of the unfairness and inefficiency that flows from evaluating SIPs based on information that was not available to a State. If the Agency wished to abandon this longstanding policy, it was required to provide a reasoned explanation for the change. EPA has failed to do so.

Independent of EPA's lack of explanation, its use of late-breaking modeling data unavailable to the State was arbitrary and capricious for a second reason. Regulated entities are entitled to know the rules by which the game will be played. EPA changed those rules mid-game by first providing the initial modeling to assist States' efforts to develop good neighbor SIPs and then, only after West Virginia had submitted its SIP using data based on the same inputs, disapproving the West Virginia SIP for failure to anticipate new modeling. States devote substantial time and energy to develop their SIPs based on the best information available to them. But according to EPA, the Agency can thwart those efforts by judging those submissions against entirely new criteria that the States never had a chance to satisfy. That result pushes States to waste resources on a futile SIP, engage in uncertain guesswork, or—to EPA's avail—give up and accept a FIP.

**B.** EPA's reliance on evolving modeling data was arbitrary and capricious for the third reason that the Version 3 modeling that it deemed "critical" to the

disapproval was not available to EPA until well after the Act required final action on the West Virginia SIP. The Act's deadlines cabin the Agency's decisional timeframe and ensure that EPA judges SIPs close in time to their development without delaying to allow new conditions or technology to overtake the States' hard work. EPA may only act according to Congress's instructions. Data that does not exist until after EPA is required to act is not a factor that Congress intended the Agency to consider. EPA's reliance on the Version 3 modeling to disapprove the West Virginia SIP was therefore arbitrary and capricious.

**C.** In response, EPA argues that it should rely on the best information available when it reviews a SIP submission, but that categorical justification aggrandizes the Agency's limited role under the Act for two independent reasons. First, EPA reviews the validity of *States'* policy judgments; it does not impose its own in the first instance. Because EPA is the policy reviewer rather than the policymaker, the relevant inquiry is whether *the States* considered the best data available *to them*. Second, assuming for the sake of argument that EPA can rely on information unavailable to West Virginia, the Agency may not use information that was unavailable to EPA until after the Agency's statutory deadline to act. Just like EPA's other errors, these tactics threaten to oust States from their "primary" role under the Act.

**III.** This Court should vacate the disapproval of the West Virginia SIP.  The Administrative Procedure Act ("APA") states in no uncertain terms that agency action that is outside an agency's statutory jurisdiction or that is arbitrary and capricious "shall" be "set aside."  That direction is mandatory.

Even if this Court were to conclude that remand without vacatur were lawful under the APA, that remedy would be inappropriate in this case.  EPA's errors in disapproving the West Virginia SIP were serious and fundamental.  Moreover, because the disapproval is already stayed, vacatur would have little disruptive consequence.

## <u>STANDARD OF REVIEW</u>

This Court reviews the Final Disapproval for compliance with the CAA under the APA.  5 U.S.C. §706.  Under the APA, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction" or arbitrary and capricious.  *Id.*  In reviewing the Final Disapproval, this Court may consider only the reasons put forth by the Agency during the rulemaking process.  *SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943).

## <u>ARGUMENT</u>

The Court should set aside EPA's disapproval of the West Virginia SIP for two independent reasons.  First, EPA acted "in excess of statutory jurisdiction," 5 U.S.C. §706(2)(C), by imposing a presumption that SIPs must follow a nationally

"uniform framework of policy judgments" in implementing the good-neighbor provision. Final Disapproval, JA517. That presumption cannot be squared with the Act's text. The Act places primary authority for developing and implementing compliance plans with *each* State. EPA's insistence on imposing its nationally uniform policy—with the Agency as policymaker-in-chief—turns that statutory design on its head.

Second and independently, EPA arbitrarily and capriciously disapproved West Virginia's SIP based on new modeling data. 5 U.S.C. §706(2)(A). By relying on data that was unavailable to the State, EPA departed without explanation from prior agency policy and also created a fundamentally unfair moving target that the State could never meet. Further, the Agency only had access to that information due to its own violation of the Act's deadlines. So even if EPA's presumption of national uniformity were lawful, and it is not, the disapproval was still improper.

This Court should grant the petition for review and vacate the disapproval.

## I.    EPA exceeded its authority under the CAA by imposing a presumption of "national uniformity" that the Act does not contain.

EPA grounded its disapproval of the West Virginia SIP in its flawed reading that the Act requires a presumption of national "uniform[ity]." That view finds no support in any statutory provision, warrants no deference from this Court, runs counter to decades-long Supreme Court precedent, and undermines the Act's foundational principle of cooperative federalism.

**A.    Under the Act's cooperative-federalism design, EPA has a limited role in the SIP process.**

1. Congress recognized States as the "primary" regulator of in-State emissions under the Act, 42 U.S.C. §7401(a)(3), and thus "relegated" EPA "to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations," *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975).  Once the Agency establishes the NAAQS, the States exercise "primary responsibility for assuring that air quality within their borders meets the NAAQS."  *Mirant Potomac River, LLC v. EPA*, 577 F.3d 223, 227 (4th Cir. 2009) (citation omitted).  "Each State is given wide discretion in formulating its plan," *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976), which in this case would include determining when a "contribut[ion]" is "significant[]," *see Michigan v. EPA*, 213 F.3d 663, 677-79 (D.C. Cir. 2000) (per curiam) (discussing the capaciousness of "significant" in the good-neighbor provision).  So long as a SIP satisfies the Act, EPA "*shall* approve" it. §7410(k)(3) (emphasis added).

That system makes sense.  The regulation of emissions involves considerations that fall historically within States' and localities' domains, like "land use control and protection of public health and natural resources."  Dwyer, *The Practice of Federalism Under the Clean Air Act*, 54 MD. L. REV. 1183, 1217 (1995). And the federal government is ill-equipped to determine policy for the Nation's diverse climates and local conditions.  "The knowledge necessary to administer any

28

air pollution control program—to set implementation and enforcement priorities and to plan for future development—can be found only at the local level." *Id.* at 1218. Even so, the federal government plays an important role by establishing baseline standards (like the NAAQs) so as to discourage the so-called "race-to-the-bottom." *See id.* at 1221-22. The Act thus "reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government." *Florida Power & Light Co. v. Costle*, 650 F.2d 579, 581 (5th Cir. 1981).

2. Although this Court has not specifically addressed the standard EPA should apply in reviewing a State's SIP submission, there are theoretically at least three standards that the Agency could apply. It could impose a presumption against State-specific solutions and toward federal control. It could engage in a neutral (or de novo) review of whether the SIP is effective. Or, the Agency could conduct a reasonableness review that accords deference to the State's conclusions. Only the third standard accords with the Act's cooperative-federalism structure. *See Virginia*, 80 F.3d at 883.

EPA's review of SIPs is narrow in scope and deferential in character. The "scope" of EPA's "responsibility" is limited to enforcing the "minimum compliance" requirements established by the Act. *Union Elec.*, 427 U.S. at 256-57; *see Florida Power*, 650 F.2d at 588 (calling this "EPA's only proper inquiry"). The Act "makes it quite clear that the [Agency] is not to be concerned with factors other

than those specified" in the text, *Union Elec.*, 427 U.S. at 257, which the State has discretion to interpret in the first instance. Within that specified scope of review, EPA must further defer to the State's chosen methods. *Texas v. EPA*, 829 F.3d 405, 428 (5th Cir. 2016) (*Texas-2016*). If the Act's requirements are met, "the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation," and the Agency may neither "question the wisdom of a State's choices of emission limitations" nor disapprove the SIP because the Agency would have analyzed the issues differently. *Train*, 421 U.S. at 79.

The Supreme Court identified EPA's "limited role" under the CAA in a related context in *Alaska Department of Environmental Conservation v. EPA*, 540 U.S. 461 (2004) (*ADEC*). That case focused on State permitting authorities' duty to "determine[]" "on a case-by-case basis" the "'best available control technology'" ("BACT") for major air pollutant emitting facilities. 42 U.S.C. §7479(3). Under the Act, EPA may step in to ensure compliance, even if the State has already decided that the facility is equipped with BACT. §§7475(a)(4), 7477. In striking a balance between the States' "primary or initial responsibility for identifying BACT" and EPA's "oversight role" in enforcement, the Court carved out a "limited role" for EPA. *ADEC*, 540 U.S. at 484, 491. In that role, EPA must "'accord appropriate deference' to States' BACT designations" and may not "'second guess' state decisions. Only when a state agency's BACT determination is 'not based on a

reasoned analysis' may EPA step in to ensure that the statutory requirements are honored." *Id.* at 490-91 (citations omitted).

This balance between the States and EPA—a hallmark of cooperative federalism—also appears in the SIP context.   As with BACT, States have "considerable leeway" in exercising the "primary responsibilit[y]" of facilitating compliance with the Act in their SIPs, with EPA serving as a backstop.  *Id.* at 490-91 (BACT); *Train*, 421 U.S. at 86-87 (SIPs).  It makes sense then for EPA to exercise the same "limited" standard of review when evaluating SIPs, *ADEC*, 540 U.S. at 491, as multiple courts of appeals have held, *see North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013); *Arizona ex rel. Darwin v. EPA*, 815 F.3d 519, 531-32 (9th Cir. 2016); *see also Wyoming v. EPA*, 78 F.4th 1171, 1181 (10th Cir. 2023) (explaining that "EPA does not have to accept unreasonable analyses that lead to an unreasonable [best available retrofit technology] determination" in a SIP but holding that EPA exceeded this limited role); *Citizens Against the Refinery's Effects, Inc. v. EPA*, 643 F.2d 183, 186 (4th Cir. 1981) (SIP "flexibility allows the states to make reasoned choices").

To be sure, the Agency can (indeed, must) disapprove a SIP that contains "no factual basis in the record" or "reasoned explanation," *ADEC*, 540 U.S. at 498-99; that is "based upon grossly erroneous data," *North Dakota*, 730 F.3d at 760, or data insufficient "for the State meaningfully to analyze" a required factor, *Arizona*, 815

F.3d at 534; or that is internally contradictory, *id.* at 535-36. But States are presumed to act in good faith in upholding federal law. *Alden v. Maine*, 527 U.S. 706, 755 (1999). Indeed, the Supreme Court observed that it would be "the unusual case" in which a State's "'arbitrary'" BACT decision would trigger EPA's obligation to step in. *ADEC*, 540 U.S. at 491; *see also id.* at 490 n.14 ("According to the Agency, '[i]t has proven to be relatively rare that a state agency has put EPA in the position of having to exercise [its] authority …." (brackets in original)).

Through this lens, the Court reviews EPA's SIP decision from a "different perspective" than it reviews other EPA actions. *Oklahoma v. EPA*, 723 F.3d 1201, 1215 (10th Cir. 2013). The question is not whether EPA's preferred regulatory framework is reasonable. It is instead whether EPA acted reasonably in concluding that the *State's* differing views were themselves unreasoned. *ADEC*, 540 U.S. at 490-91. While EPA may have "far more discretion" to impose its policy choices once it takes on the task of promulgating a FIP, the Agency cannot force those policy choices onto the States when it makes the initial decision to disapprove a SIP. *Texas v. EPA*, 2023 U.S.App.LEXIS 13898, at *20 (5th Cir. May 1, 2023) (per curiam) (*Texas-2023*) (granting a motion to stay EPA's disapproval of the Texas and Louisiana SIPs in the Final Disapproval); *accord Wyoming*, 78 F.4th at 1178.

**B.    EPA overstepped its limited role by requiring West Virginia to justify any deviation from the Agency's policy preferences.**

1. In the Final Disapproval, EPA went far beyond its properly limited scope of review by imposing a presumption of uniformity. The Agency rejected any "obligat[ion] to defer to states' choices in the development of good neighbor SIP submissions." Final Disapproval, JA552. Instead it expressly sought to enforce a "nationally consistent approach" to ozone pollution through an ad hoc "uniform framework of policy judgments." JA516-JA517. When imposing a "uniform framework of policy judgments," there can be but one policymaker—the Agency. As a result, each SIP presumptively had to follow EPA's four steps and reach the same conclusions at each step as EPA would reach.

By EPA's telling, national uniformity "is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors." JA539. Not only do "[e]ffective policy solutions to the problem … *necessitate[]* the application of a uniform framework," the Agency explained, but commenters who claimed "that the EPA must allow states to take inconsistent approaches" are "incorrect" as a matter of law. JA517 (emphasis added). EPA therefore allowed "deviation[s] from" its preferred "nationally consistent approach" only when a State could "substantially justif[y]" its position. *Id.*

The requirement of uniformity pervades EPA's rejection of West Virginia's SIP. West Virginia used EPA's non-binding four-step approach to organize its SIP, but the Agency insisted that the State must substantially justify any conclusions that differed from EPA's. For example, at Step 2, the Agency acknowledged the salience of West Virginia's argument that high traffic and population density near downwind receptors "have a large impact on the ozone nonattainment status of these areas." Proposed Disapproval, JA316; Final Disapproval, JA554. Yet the Agency doubled down that under its "4-step process," the proper "analysis starts at the question of whether the state's emissions have a projected impact above the 1 percent of the NAAQS threshold." Proposed Disapproval, JA316. EPA also rejected West Virginia's use of wind back-trajectories, which it found to be less informative than "EPA's analysis of transported emissions … us[ing] updated, photochemical grid modeling" because of "uncertainties" in West Virginia's approach. *Id.* The Agency repeated its refrain that the goal was "national consistency" along with "parity[] and equity across state lines." Final Disapproval, JA548, JA550-JA551. And despite the Supreme Court's admonition that the Agency "is relegated by the Act to a secondary role," *Train*, 421 U.S. at 79, the Agency flat-out rejected any "characterization of [its] role" in the SIP process as "'secondary,'" Final Disapproval, JA544, other than to "acknowledge that its role could be considered

'secondary' in that it occurs 'second' in time," JA415 (Response to Comment ("RTC")).

The Agency further confirmed its desire to impose uniform policy judgments over State-driven solutions by timing its SIP and FIP actions as it did. No FIP is necessary if "the State corrects [a] deficiency, and the [Agency] approves the plan or plan revision." 42 U.S.C. §7410(c). Yet after waiting a year and a half beyond its deadline to act on the West Virginia SIP, the Agency issued a FIP with astonishing speed, beating its FIP deadline by about 23 months and depriving the State of any opportunity to correct its alleged errors. *See* §7410(c)(1); pp.15-17, *supra*.

2. None of this is required by the Act. As explained above (pp.28-32), Congress provided States great latitude in implementing their good-neighbor obligations, not a straightjacket. The Act does not demand lockstep compliance with a uniform good-neighbor policy. *Texas-2023*, 2023 U.S.App.LEXIS 13898, at *17-*19. "National uniformity" is not listed as a relevant criterion for SIP formulation, and EPA has unsurprisingly cited no statutory basis for imposing such a requirement. Indeed, the requirement is anathema to cooperative federalism which favors State-specific solutions over top-down national control.

Instead, a SIP must "contain adequate provisions" to prohibit emissions in amounts that will "contribute significantly to nonattainment in, or interfere with

maintenance by, any other State with respect to [the NAAQS]." 42 U.S.C. §7410(a)(2)(D)(i)(I). The Supreme Court has recognized that those provisions give "the States considerable latitude" and "discretion" to decide how to meet their obligations, *Train*, 421 U.S. at 86-87, which in this case would include determining when a "contribut[ion]" is "significant[]," *see Michigan*, 213 F.3d at 677-79.

Nor does (or can) EPA claim that it is following a duly promulgated regulation that interprets the statute or is entitled to any binding deference. *See* pp.6-7, *supra*. Indeed, EPA's own practice underscores that its four-step approach is at best only one "'reasonable'" implementation of the good-neighbor provision, not a statutory requirement. *EME Homer*, 572 U.S. at 518-20 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984)) (approving a FIP). The Agency's prior changes to the approach, *see, e.g.*, 81 Fed. Reg. at 74517, and purported "open[ness] to alternative approaches states may present," Final Disapproval, JA517, are incompatible with a belief that this approach is statutorily required.

The Act "'allows *the States*, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs.'" *Virginia*, 80 F.3d at 883 (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289 (1981)) (emphasis added). They bear the "primary responsibility for formulating pollution control strategies." *Union Elec.*, 427 U.S. at 256; 42 U.S.C. §7401(a)(3). EPA's rejection of this balanced

system of cooperative federalism and insistence that States fall in line with the Agency's "uniform" set of "policy judgments" for "[e]ffective policy solutions to the problem of interstate ozone transport," Final Disapproval, JA517, is in excess of its statutory jurisdiction.  5 U.S.C. §706(2)(C); *Union Elec.*, 427 U.S. at 257.

### C.   EPA cannot offer any sound justification for exceeding its statutory authority under the Act.

EPA's justifications for imposing a presumption of national uniformity in the face of the Act's cooperative-federalism structure do not stand up to scrutiny. Nothing in the Act mandates that States defend their "primary responsibility for formulating pollution control strategies," *Union Elec.*, 427 U.S. at 256, by substantially justifying differences in opinion with EPA.  *Texas-2023*, 2023 U.S.App.LEXIS 13898, at *19-*20.

First, EPA responds that its four-step approach is not "an arbitrary 'policy preference' but the application of a judicially-tested and upheld framework."  JA425 (RTC); *see* Final Disapproval, JA517.  West Virginia does not dispute that EPA's four-step approach *can be* a "reasonable" implementation of the good-neighbor provision.  And if this Court were reviewing a FIP, that point would count in EPA's favor.  *See, e.g.*, *EME Homer*, 572 U.S. at 518-20.  But this Court must review disapproval of a *SIP* from a "different perspective."  *Oklahoma*, 723 F.3d at 1215. Again, the focus is not whether EPA's preferred implementation is reasonable; it is whether *West Virginia* reasonably exercised *its* authority under the good-neighbor

provision and, consequently, whether EPA acted lawfully when it answered that question in the negative. *ADEC*, 540 U.S. at 490-91. The Agency has no discretion to reject a SIP simply because a State exercised independent judgment regarding how to implement its good-neighbor obligations. 42 U.S.C. §7410(k)(3); *Union Elec.*, 427 U.S. at 257. And EPA certainly cannot insist that a State "substantially justif[y]" that decision or else have its SIP disapproved, especially when the Agency has not even suggested that its approach is the *only* reasonable one. Final Disapproval, JA517; Proposed Disapproval, JA309.

EPA's repeated assertion that interstate ozone emissions are uniquely deserving of centralized regulation by the federal government is of no help, either. *See, e.g.*, Final Disapproval, JA516-JA517, JA539, JA542, JA550-JA552. West Virginia does not contest that ozone pollution travels across state borders. But "[n]othing in the Act differentiates the Good Neighbor Provision from the several other matters a State must address in its SIP," *EME Homer*, 572 U.S. at 509, or gives EPA greater control over States' good-neighbor obligations than over any other SIP requirements, *see* 42 U.S.C. §7410(a)(2), (k)(3). EPA admits as much. JA426 (RTC) (acknowledging that its "authority to assess a SIP submission for compliance with the [good-neighbor provision] is the same" as for compliance with other CAA requirements). Just like all other SIP requirements, the Act subjects States' good-

neighbor obligations to a careful scheme of cooperative federalism in which the States, not EPA, are in the driver's seat. *See generally* §7410.

### D. This Court should require EPA to apply the proper deferential standard of review in the first instance.

EPA's disapproval may only be upheld by this Court, if at all, on "the grounds upon which the agency acted." *Chenery*, 318 U.S. at 95. Once the Agency's "error of law is laid bare," the "function of the reviewing court ends." *FPC v. Idaho Power Co.*, 344 U.S. 17, 20 (1952). EPA's error below was subjecting the SIP to a level of scrutiny inconsistent with the Act and thereby imposing an unlawful presumption of uniformity. The "'proper course'" for this Court is to remand with instructions to the Agency to review the SIP with appropriate deference to the State. *Calcutt v. FDIC*, 598 U.S. 623, 629 (2023) (per curiam) (citation omitted). This Court cannot evaluate the SIP in the first instance.

There is no question, however, that EPA should approve the SIP on remand, as the West Virginia SIP was based on reasoned decision-making. *See ADEC*, 540 U.S. at 490. At Step 1, the State analyzed EPA's initial modeling and compared its results against modeling from two other sources to assess consistency and find "the most appropriate, robust modeling available." JA048, JA051-JA055. At Step 2, the State relied on a multitude of tools to determine whether the Alpine modeling on which it relied overstated or understated the State's contribution to downwind receptors. *See* pp.10-11, *supra*. Considering the "downwind air quality context"

(*i.e.*, the role of local emissions near the receptors), West Virginia discovered that every downwind receptor to which it was "linked" was located near Interstate 95. That meant that a substantial amount of the $NO_x$ found at those receptors came from local mobile sources, such as high-emitting vehicles along the highway and near the receptors. *See id.* Wind back-trajectories, too, confirmed that West Virginia played only a small role in contributing $NO_x$ to these downwind receptors (between 1.02% and 3.05% of all contributions). JA224, JA234, JA243. And all that is not even to mention the important role played by international emissions in pushing the lone non-attainment receptor into non-attainment status. JA062-JA063.

Despite these signs that West Virginia did not contribute significantly to these receptors' nonattainment or maintenance status (signs that the EPA had expressly invited the State to consider in previous guidance, JA056), the State also assessed whether cost-effective controls may nevertheless be available. The State broke down into six categories those sources that made up 95% of the State's $NO_x$ emissions in 2017. JA066. Almost 30% of the State's $NO_x$ emissions came from highway and off-highway vehicles driving through West Virginia.[8] *Id.* These mobile sources are not permanently situated in or subject to the rules of West Virginia. Rather, they may be garaged anywhere in the Nation and simply pass

---

[8] These are different mobile sources than those driving near the downwind receptors along Interstate 95, which contribute to the downwind air quality context.

through the State's borders.  The State can exercise only limited control over them—both as practical and constitutional matters—which is why they are appropriately "regulated at the federal level not the state level."  JA066-JA067; *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 379 n.2 (2023) (acknowledging that the Court has limited State regulation of the interstate flow of goods); Final Disapproval, JA554 (commenting on EPA's history of "regulating mobile source emissions since it was established as a Federal agency").

As for the other categories, West Virginia determined that the modeling overstated the emissions from fuel-combustion facilities (EGUs, Industrial, and "Other") because numerous facilities had already shut down since 2011 (the base year for the modeling) or were scheduled to shut down by 2021—17 of 38 coal-fired EGUs and 15 of 30 non-EGU sources.  JA069, JA071-JA074.  The State further determined that it had already implemented all cost-effective controls based on EPA's own analyses in prior FIPs.  JA072-JA074.  Finally, for petroleum-related industries, West Virginia explained that its existing State-law permitting programs were already "*more* stringent" than what federal law requires.  JA066-JA067 (emphasis added).

At Step 4, the State described its existing State regulations that implement and enforce the control measures EPA has previously deemed appropriate for West Virginia.  West Virginia administers a number of programs designed to limit

emissions from sources within the State.  JA078-JA082.  The State further detailed how existing and new State regulations would prevent new or modified sources from increasing West Virginia's contributions to downwind receptors.  JA078-JA091.

If EPA were standing in West Virginia's shoes, it might take a different approach and reach different conclusions.  But the State, as the primary regulator of emissions within its borders, 42 U.S.C. §7401(a)(3), provided an analysis and conclusions well within the realm of reasonableness and the exercise of its discretion, *see ADEC*, 540 U.S. at 490-91.

## II. EPA's use of late-breaking modeling was independently arbitrary and capricious.

Though EPA's overstepping of its limited role under the Act is a sufficient basis to grant the petition for review, EPA independently erred by arbitrarily and capriciously relying on new modeling data in enforcing its presumption in the Final Disapproval.  *See* 5 U.S.C. §706(2)(A).  In other words, even if the presumption of national uniformity were lawful, the disapproval was still improper.

EPA acted improperly in several ways.  An agency rule is arbitrary and capricious when the agency fails to explain a departure from a prior policy, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), when the agency surprises regulated parties through its change in position, *see Wages & White Lion Investments, LLC v. FDA*, 90 F.4th 357, 374 (5th Cir. 2024) (en banc), or when it "relie[s] on factors which Congress has not intended it to consider," *Motor Vehicle*

42

*Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Final Disapproval contained each of these flaws.

First, EPA provided no explanation for abandoning its longstanding policy to consider only data available at the time of SIP submission. Second, the Agency pulled a "'surprise switcheroo'" on the State by changing the standards against which the Agency would measure the SIP. *Texas-2023*, 2023 U.S.App.LEXIS 13898, at *25 (quoting *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005)). And third, the Version 3 modeling data was not a factor that Congress intended EPA to rely upon because the data did not exist at the time the Agency was statutorily required to act on the West Virginia SIP.

### A. EPA's reliance on new modeling unavailable to the State departed from longstanding EPA policy and deprived the State of the opportunity and ability to satisfy the Agency's criteria.

West Virginia assessed multiple models when creating its SIP—all relying on a 2011 base year, just like the initial modeling that EPA had distributed "to assist states' efforts to develop good neighbor SIPs." JA048, JA051-JA055 (SIP); JA248 (EPA guidance). As the State noted, all three models reflected "remarkably comparable impacts" at downwind receptors. JA325. The State then spent the remainder of its SIP assessing the various sources inside and outside the State that contributed to each of these receptors, the origin and path of air masses that delivered high levels of $NO_x$ to these receptors over a two-year period, and whether cost-

effective controls existed to reduce contributions to those receptors. *See* pp.10-12 , *supra*. In line with EPA's consistent receptor-based analysis in the good-neighbor context, *see, e.g.*, JA275-JA279 (EPA guidance), West Virginia channeled its focus on the specific receptors to which, according to the best available data at the time, it was projected to contribute ozone emissions.

EPA then pulled a surprise switcheroo. It announced in the Proposed Disapproval that it would rely on the Version 2 modeling, which used an entirely different base year than the initial modeling it had sent out to the States or the Alpine modeling on which West Virginia had relied. The Version 2 modeling linked the State to four receptors—none of which had been identified in the Alpine modeling and only two of which had been identified in EPA's initial modeling. The State was understandably "puzzled by EPA's abandonment of its own modeling results," JA325 (comments), but it turned out EPA was not done. The Agency would ultimately disapprove the West Virginia SIP based on the even newer *Version 3* modeling, which the Agency deemed "critical" to its decision. Final Disapproval, JA520, JA537. West Virginia could not have foreseen (nor was it required to foresee) these developments. EPA erred both by departing from longstanding agency practice and by unfairly moving the State's goalposts (rather than using the tools available to the Agency, *see* p.52, *infra*).

First, EPA departed from longstanding practice with no explanation at all, let alone a reasonable one. *See Kentucky v. EPA*, 2023 U.S.App.LEXIS 18981, at *10-*11 (6th Cir. July 25, 2023) (order) (granting a motion to stay EPA's disapproval of the Kentucky SIP in the Final Disapproval). The Agency has long recognized (until now) that "[e]valuating a plan element based on information that was not available at the time of submittal would create a moving target that would be impossible to meet." 69 Fed. Reg. 21717, 21727 (Apr. 22, 2004); *see, e.g.*, 87 Fed. Reg. 68483, 68486 (Nov. 15, 2022); 86 Fed. Reg. 67329, 67333 (Nov. 26, 2021); 81 Fed. Reg. 59876, 59878 n.15 (Aug. 31, 2016).

EPA has even noted that when the D.C. Circuit "addressed a similar issue" in the context of a SIP's rate-of-progress plan,[9] that court "affirmed EPA's position" that SIPs should be evaluated based on the information available to the States at the time of submission. 69 Fed. Reg. at 21727 n.20 (citing *Sierra Club v. EPA*, 356 F.3d 296 (D.C. Cir. 2004)). In *Sierra Club*, the Agency did not require States to revise their rate-of-progress plans based on new modeling data that was made available to the States "just one month before the States submitted their SIPs and long after the modeling had been completed and the [SIPs] prepared." 356 F.3d at 308. "As the

---

[9] For certain nonattainment areas, a State must submit to EPA a rate-of-progress plan that demonstrates a specified rate of reduction of baseline emissions. *Sierra Club v. EPA*, 356 F.3d 296, 299 (D.C. Cir. 2004) (citing 42 U.S.C. §7511a(c)(2)(B), (d)).

agency explain[ed], 'emissions factors, as well as inventory calculation methodologies, are continually being improved.'" *Id.* (citation omitted). The D.C. Circuit agreed, observing that "[t]o require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval processes." *Id.*; *cf. Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1230 (D.C. Cir. 1994) (finding that an agency reasonably used "the most reliable data available" even though later data might be different, as the contrary argument "would require the Secretary to make virtually continuous adjustments").

If, in reviewing West Virginia's SIP, EPA wished to abandon this "longstanding policy," 81 Fed. Reg. at 59878 n.15, it was required to "provide a reasoned explanation for the change," *Encino*, 579 U.S. at 221; *see Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) (holding that FERC did not adequately explain its new position that the agency could consider "more recent" data in judging the lawfulness of an earlier rate increase). Yet EPA did not even "'display awareness that it [was] changing position.'" *Encino*, 579 U.S. at 221 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *see* JA393 (RTC) (distinguishing *Sierra Club*, 356 F.3d 296, and arguing that its position in that case was fact-specific). EPA cannot "depart from [its] prior policy *sub silentio.*" *Fox Television Stations*, 556 U.S. at 515.

Second, and independent of EPA's failure to explain its change in position, the Agency's use of late-breaking modeling data was arbitrary and capricious because it unfairly moved West Virginia's goalposts, *Texas-2023*, 2023 U.S.App.LEXIS 13898, at \*21-\*26; *Kentucky*, 2023 U.S.App.LEXIS 18981, at \*9-\*11, sending the State "on a wild goose chase," *see Wages & White Lion*, 90 F.4th at 362. "Those regulated by an administrative agency are entitled to 'know the rules by which the game will be played.'" *Alaska Pro. Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) (quoting Holmes, *Holdsworth's English Law*, 25 L.Q. REV. 412, 414 (1909)), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015); *see Wages & White Lion*, 90 F.4th at 379 ("If an agency could instead move the scientific goalposts and then refuse to specify the new scientific goal line, the administrative process would be governed not by science but by diktat."). Any other arrangement "raises troubling questions about due process and fair notice." *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 969 (10th Cir. 2016) (Gorsuch, J.). Indeed, changing the rules midway through the game is generally a sign of arbitrary and capricious agency behavior. *See Danti v. Lewis*, 312 F.2d 345, 349 (D.C. Cir. 1962) (deeming arbitrary and capricious the denial of an application because the application did not satisfy a subsequently passed resolution).

As the Agency recognizes, "states generally develop[] their SIP submissions with the best available information at the time of their development." Final Disapproval, JA543. But according to EPA, the Agency can then evaluate those submissions against entirely new criteria. *Id.* This set-up puts the States in the position of choosing among three intolerable options. They may invest the "significant work" necessary to create the SIP, 87 Fed. Reg. at 68486, only to have it disapproved for reasons beyond their control. They may attempt to "develop a SIP submission based on some unknown future data." Final Disapproval, JA542-JA543. Or they may throw up their hands, abdicate their "primary" role as the regulator of emissions within their borders, and let EPA take control through a FIP. *See* 42 U.S.C. §§7401(a)(3), 7410(c). The first option is fundamentally unfair. *See Alaska Pro. Hunters*, 177 F.3d at 1035. The second is near impossible. *See* Final Disapproval, JA542-JA543 (disavowing any such expectation). And the last is flatly inconsistent with Congress's creation of a cooperative-federalism regime. *See Virginia*, 80 F.3d at 883. To be sure, "[t]here will *always* be situations when new, better information is on the horizon." 69 Fed. Reg. at 21727 (emphasis added). But the requirement of reasoned decisionmaking "'does not allow the EPA to keep moving the finish line'" whenever that information arrives. *Kentucky*, 2023 U.S.App.LEXIS 18981, at *10 (quoting *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020)).

EPA's citation in the Final Disapproval to the D.C. Circuit's decision in *Wisconsin* does not hold to the contrary. *See* Final Disapproval, JA543 (citing *Wisconsin*, 938 F.3d at 322, for the proposition that limiting the data EPA can consider would "lead to an anomalous result"). There, the court held that EPA could use projected data to determine future nonattainment status (rather than look only at past emissions values). *Wisconsin* says nothing of EPA's claimed authority to use post-hoc modeling to disapprove a SIP that correctly looked ahead to future years. 938 F.3d at 321-22.

**B. EPA's reliance on evolving modeling data was arbitrary and capricious because the Version 3 modeling was unavailable to EPA by the time the Act required final action on the West Virginia SIP.**

The modeling data was not only unavailable to West Virginia at the time it formulated and submitted its SIP; it was also unavailable to the Agency until after the statutory deadline to act on the West Virginia SIP. Yet EPA made clear that this modeling played a "critical role" in its disapproval of the SIP. Final Disapproval, JA520. The fact that the modeling post-dated EPA's statutory deadline provides yet a third basis for holding that EPA's use of the Version 3 modeling data was arbitrary and capricious.

The Act imposes strict deadlines on EPA's decision to approve or disapprove a SIP, mandating a decision within 12 months of a completeness finding. 42 U.S.C. §7410(k)(2). EPA was thus required to act on the West Virginia SIP by August 4,

2020.  *See* p.12, *supra*.  This constraint serves more than a procedural purpose.  Air-quality regulation is a field in which newer technology and better data is always around the corner.  69 Fed. Reg. at 21727.  If hindsight (in the form of newer data) always wins, then EPA will always be in the better position to regulate in-State emissions, in contravention of the Act's declaration that "air pollution prevention" and "air pollution control" is "the primary responsibility of States."  §7401(a)(3).  EPA, after all, always gets to speak last.  By "cabining the Agency's decisional timeframe," Congress gave States the certainty they need to act today without wondering whether to wait for tomorrow's developments.  *Texas-2023*, 2023 U.S.App.LEXIS 13898, at *27.  But the Version 3 modeling that EPA deemed "critical" to its disapproval did not materialize until long after EPA missed its deadline.  Final Disapproval, JA520-JA521, JA535.

Data that does not exist until after Congress intends an agency to act is necessarily a "factor[] which Congress has not intended [the agency] to consider."  *State Farm*, 463 U.S. at 43.  EPA's authority is strictly limited by statutory deadline.  42 U.S.C. §7410(k)(2).  If that deadline means anything, it must delimit the information on which EPA can rely in evaluating a SIP.  *Texas-2023*, 2023 U.S.App.LEXIS 13898, at *27.  EPA "may not use its own delay as an excuse for imposing burdens on [West Virginia] that" the Act "does not permit."  *Texas-2016*, 829 F.3d at 430.

**C.    EPA's assertion that it should use the best information available is inconsistent with its limited role under the Act.**

EPA's main defense of its constantly moving goalposts was to claim the freedom to "tak[e] rulemaking action using the best information available to it at the time it takes such action."  Final Disapproval, JA542-JA543.  But that response ignores prior agency practice and two (already discussed) aspects of EPA's role in the SIP process—each of which independently refutes EPA's position.

First, EPA reviews the validity of *States'* policy judgments; it does not impose its own in the first instance.  The Act makes the Agency's reviewer role clear by instructing that EPA can impose a FIP only *after* it rejects a SIP for failing to meet the Act's requirements.  In short, the *States* are the actors in question.  So it is the "information available" to the *States* that determines the propriety of a SIP, and EPA may not delay acting on SIP submittals to generate new data that States have no opportunity to consider.  *See* pp.47-49, *supra*.

Of course, holding EPA to its role as reviewer (rather than creator) of NAAQS implementation policy does not deprive the Agency of the ability to keep regulations up to date.  Even within is reviewing role, EPA has the tools to ensure use of "the best information available."  Final Disapproval, JA543.  For example, the Agency can approve SIPs based on the information available to the States and then issue a "SIP call" that requires States to reassess whether their plans are adequate in light of new data.  *See* 42 U.S.C. §7410(k)(5); *North Carolina*, 615 F.3d at 300; *see also*

§7410(a)(2)(H)(ii) (stating States shall revise their SIPs upon a finding by the Agency "on the basis of information available to [EPA] that the plan is substantially inadequate to attain the [NAAQS]").  But that is not what EPA has attempted to do here in using new data to refuse to approve a SIP in the first place.

Second, *even if* EPA can rely on information unavailable to West Virginia when the State formulated its SIP, it does not follow that EPA can ignore the time limits Congress imposed on the Agency's decisionmaking authority.  The Act's deadlines "cabin[] the Agency's decisional timeframe" and thus limit the information that may inform EPA's actions.  *Texas-2023*, 2023 U.S.App.LEXIS 13898, at \*27; *see* pp.49-50, *supra*.  By arbitrarily disregarding those deadlines, EPA effectively seeks to overtake the States' "primary" role under the Act.  42 U.S.C. §7401(a)(3).

The Agency asserted in the Final Disapproval that the only "recourse" for a missed EPA deadline is "a court-ordered deadline."  Final Disapproval, JA542.  Even if that proposition is true with respect to the specific action required by the deadline, it misses the relevant point here.  A statutory deadline that "cabin[s] the Agency's decisional timeframe," *Texas-2023*, 2023 U.S.App.LEXIS 13898, at \*27, not only mandates a decision by that date, it also delimits the temporal scope of the "factors which Congress … intended [the Agency] to consider," *State Farm*, 463 U.S. at 43.  Here, the State seeks to enforce that limitation on the scope of EPA's

decisionmaking authority, not to compel the action required by the deadline, *i.e.*, publication of the SIP approval or disapproval.[10]

## III.    This Court should vacate the disapproval of the West Virginia SIP.

Once this Court holds that EPA's disapproval of the West Virginia SIP is "unlawful," either because it is "in excess of [the Agency's] statutory … authority" or because it is arbitrary and capricious, the next step is straightforward:  "set [the disapproval] aside."  5 U.S.C. §706(2).  "This Court has never formally embraced" the "remand-without-vacatur approach" taken by the D.C. Circuit, *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018), which runs counter to the APA's plain language.  In any event, this would be a poor case in which to employ that approach even under D.C. Circuit precedent.

### A.    The APA does not allow remand without vacatur in these circumstances.

The APA's instructions on how to remedy unlawful agency action "could not be clearer."  *Comcast Corp. v. FCC*, 579 F.3d 1, 10 (D.C. Cir. 2009) (Randolph, J., concurring).  Under Section 706, a "reviewing court *shall*—(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set

---

[10] EPA's limited role in this cooperative-federalism regime presents a materially different set-up than what this Court considered in *Avail Vapor, LLC v. FDA*, in which this Court rejected an argument that would cause the Food and Drug Administration's "deliberations" regarding the emerging and evolving market of e-cigarettes to "become frozen in time."  55 F.4th 409, 424 (4th Cir. 2022).

aside agency action, findings, and conclusions found to be," among other things, arbitrary and capricious or in excess of statutory jurisdiction. §706 (emphasis added).

In holding that this provision "unequivocally mandates that courts 'shall' compel unlawfully withheld agency action," this Court explained that "[i]n §706(1), as in most circumstances, 'shall' means 'shall.'" *South Carolina v. United States*, 907 F.3d 742, 758 (4th Cir. 2018). The word "shall" is equally unequivocal as applied to Section 706(2): a reviewing court "*shall … set aside agency action*" found to be unlawful. §706(2) (emphasis added); *see Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (observing that courts "must interpret [a] statute consistently" from case to case). So in "all" cases wherein a court finds agency action unlawful, the "agency action *must* be set aside." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971), *abrogated on other grounds by Califano v. Sanders*, 420 U.S. 99 (1977) (emphasis added).

To "'[s]et aside' means [to] vacate." *Comcast*, 579 F.3d at 10 (Randolph, J., concurring); *In re Clean Water Act Rulemaking*, 60 F.4th 583, 594 (9th Cir. 2023). Put simply, "whenever a reviewing court finds an administrative rule or order unlawful, the [APA] requires the court to vacate the agency's action." *Comcast*, 579 F.3d at 10 (Randolph, J., concurring); *see Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam) ("If that finding is not sustainable on the administrative record made,

then the Comptroller's decision must be vacated and the matter remanded to him for further consideration." (applying §706(2)).

**B.    Remand without vacatur is inappropriate in this case.**

Even if remand without vacatur were lawful, this case is not one of the "limited circumstances" in which it would be appropriate. *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020). Before providing this "exceptional remedy," the D.C. Circuit considers (1) the seriousness of the action's deficiencies, and (2) the likely disruptive consequences of vacatur. *Id.* at 518-19 (citing *Allied-Signal, Inc. v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Both factors weigh against EPA's request.

The deficiencies are very serious. EPA analyzed the West Virginia SIP under an incorrect legal standard that turned the Act's fundamental premise of cooperative federalism upside down. *See* pp.27-42, *supra*. And EPA's ever-evolving shell game with its modeling data further undercuts the carefully prescribed SIP-review process in which States play the "primary" role as regulators of emissions within their borders. 42 U.S.C. §§7401(a)(3), 7410(c); pp.42-53, *supra*.

Moreover, vacating the disapproval of the West Virginia SIP would not pose unduly disruptive consequences. The disapproval is already stayed, so vacatur would not alter the status quo. *See West Virginia*, 90 F.4th at 332. And West Virginia will not leave $NO_x$ emissions uncontrolled; the State will continue to

implement and enforce existing regulations governing West Virginia emissions, including EPA's own 2016 FIP.  *See* 81 Fed. Reg. 74504 (Oct. 26, 2016) (covering West Virginia).

## CONCLUSION

For the foregoing reasons, this Court should grant the petition for review and vacate the disapproval of the West Virginia SIP.

## STATEMENT REGARDING ORAL ARGUMENT

This case raises important questions regarding interpretation of the Clean Air Act and application of administrative-law principles.  West Virginia believes that oral argument would be helpful to this Court's decision-making process.

Dated: June 3, 2024

Respectfully submitted,
/s/ Elbert Lin

PATRICK MORRISEY
*Attorney General*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
lindsay.s.see@wvago.gov

LINDSAY S. SEE
*Solicitor General*
*Counsel of Record*

MICHAEL R. WILLIAMS
*Principal Deputy Solicitor General*

*Counsel for Petitioner State of West Virginia*

Elbert Lin
Kevin S. Elliker
David N. Goldman
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
(804) 788-8200
elin@HuntonAK.com
kelliker@HuntonAK.com
dgoldman@HuntonAK.com

E. Carter Chandler Clements
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037
(202) 955-1500
eclements@HuntonAK.com

*Special Assistant Attorneys General*

*Counsel for Petitioner*
*State of West Virginia*

57

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,000 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman font, using Microsoft Word.

/s/ Elbert Lin
Elbert Lin

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3d day of June, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system, which shall send notification of such filing to all CM/ECF participants.


/s/ Elbert Lin
Elbert Lin