No. 23-1418

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

STATE OF WEST VIRGINIA,
Petitioner,

*v*.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
Respondents.

_____

PETITIONER'S REPLY BRIEF

_____

PATRICK MORRISEY
*Attorney General*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
lindsay.s.see@wvago.gov

LINDSAY S. SEE
*Solicitor General*
*Counsel of Record*

MICHAEL R. WILLIAMS
*Principal Deputy Solicitor General*

*Counsel for Petitioner State of West Virginia*

Elbert Lin
Kevin S. Elliker
David N. Goldman
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, East Tower
Richmond, VA  23219
(804) 788-8200
elin@HuntonAK.com
kelliker@HuntonAK.com
dgoldman@HuntonAK.com

E. Carter Chandler Clements
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC  20037
(202) 955-1500
eclements@HuntonAK.com

*Special Assistant Attorneys General*

*Counsel for Petitioner*
*State of West Virginia*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................ i

TABLE OF AUTHORITIES ..................................................................... ii

ARGUMENT .............................................................................................1

  I.   EPA Reviewed the SIP Under the Wrong Legal Standard. ............................2

    A.  EPA applied an unlawful presumption against West Virginia's SIP........... 2

    B.  EPA's "independent" review standard is incorrect. ........................................ 7

    C.  Under the correct legal standard, EPA should have approved the West Virginia SIP. ................................................................................ 10

  II.  EPA's Use of Post-Submittal Modeling Was Arbitrary and Capricious. ......15

    A.  EPA departed from longstanding policy in relying on data that was unavailable to West Virginia while it developed its SIP. ........................... 16

    B.  Even if EPA had not previously had a policy, it was arbitrary and capricious for EPA to move the goalposts during the SIP process. ........... 18

    C.  By relying on modeling data unavailable until after EPA's statutory deadline to act on the West Virginia SIP, the Agency relied on factors Congress did not allow it to consider.......................................... 20

    D.  The Change in Modeling Was Not Harmless. ............................................ 21

  III.  This Court Should Vacate the SIP Disapproval.........................................23

CONCLUSION .......................................................................................25

CERTIFICATE OF COMPLIANCE.....................................................27

CERTIFICATE OF SERVICE ..............................................................27

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1000 Friends of Md. v. Browner*,
　265 F.3d 216 (4th Cir. 2001) ................................................................14, 19

*Alaska Dep't of Envt. Conservation v. EPA*,
　540 U.S. 461 (2004).........................................................7, 8, 9, 14, 15

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
　522 U.S. 359 (1998).........................................................................3

*Am. Great Lakes Ports Ass'n v. Schultz*,
　962 F.3d 510 (D.C. Cir. 2020)........................................................23, 24

*Arizona ex rel. Darwin v. EPA*,
　815 F.3d 519 (9th Cir. 2016) ...........................................................10

*Calcutt v. FDIC*,
　598 U.S. 623 (2023) (per curiam).....................................................10

*Cent. Me. Power Co. v. FERC*,
　252 F.3d 34 (1st Cir. 2001)..............................................................23

*Comcast Corp. v. FCC*,
　579 F.3d 1 (D.C. Cir. 2009)............................................................23

*Encino Motorcars, LLC v. Navarro*,
　579 U.S. 211 (2016).......................................................................18

*EPA v. EME Homer City Generation, L.P.*,
　572 U.S. 489 (2014).........................................................6, 7, 17, 24

*Kisor v. Wilkie*,
　588 U.S. 558 (2019).......................................................................8

*Massachusetts Trs. of E. Gas & Fuel Assocs. v. United States*,
　377 U.S. 235 (1964).......................................................................22

ii

*McMellon v. United States*,
    387 F.3d 329 (4th Cir. 2004) (en banc) ...........................................................4

*Michigan v. EPA*,
    213 F.3d 663 (D.C. Cir. 2000)...................................................................13

*Michigan v. EPA*,
    576 U.S. 743 (2015)....................................................................................4

*Mirant Potomac River, LLC v. EPA*,
    577 F.3d 223 (4th Cir. 2009) .....................................................................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).................................................................................9, 20

*Nat. Res. Def. Council, Inc. v. EPA*,
    824 F.2d 1146 (D.C. Cir. 1987) (en banc).................................................16

*Ngarurih v. Ashcroft*,
    371 F.3d 182 (4th Cir. 2004) ...................................................................22

*North Dakota v. EPA*,
    730 F.3d 750 (8th Cir. 2013) ..........................................................7, 10, 15

*Sea "B" Min. Co. v. Addison*,
    831 F.3d 244 (4th Cir. 2016) ...................................................................22

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)..............................................................................7, 11

*Sierra Club v. EPA*,
    356 F.3d 296 (D.C. Cir. 2004)..................................................................16

*Sierra Club v. EPA*,
    60 F.4th 1008 (6th Cir. 2023) ...................................................................23

*Sierra Club v. EPA*,
    671 F.3d 955 (9th Cir. 2012) ...................................................................19

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ...............................................................9, 21

*Train v. Nat. Res. Def. Council, Inc.*,
   421 U.S. 60 (1975).................................................................7, 15

*Union Elec. Co. v. EPA*,
   427 U.S. 246 (1976).................................................................6, 9

*Virginia v. Browner*,
   80 F.3d 869 (4th Cir. 1996) .........................................................10

*West Virginia v. EPA*,
   90 F.4th 323 (4th Cir. 2024) ...............................................4, 5, 24

*Westar Energy, Inc. v. FERC*,
   473 F.3d 1239 (D.C. Cir. 2007)......................................................5

*Williams v. Garland*,
   59 F.4th 620 (4th Cir. 2023) ..........................................................4

*Wisconsin v. EPA*,
   938 F.3d 303 (D.C. Cir. 2019) (per curiam)..............................20, 21

*Wyoming v. EPA*,
   78 F.4th 1171 (10th Cir. 2023) .......................................................6

**Statutes**

5 U.S.C. §§

   706 ........................................................................................8

   706(2).....................................................................................23

42 U.S.C. §§

   7401(a)(3) ..........................................................................14, 17

   7410(a)(2)(D)(i) .......................................................................3

   7410(a)(2)(D)(i)(I).................................................................11, 12

   7410(c)(1) ...............................................................................17

7410(c)(1)(B) ............................................................17

7410(k)(2) ...............................................................20

7410(k)(3) .................................................................8

7410(k)(5) ...............................................................21

7410(*l*) ...................................................................21

7426(b) ...................................................................21

7509a ......................................................................14

7607(b)(1) .................................................................4

**Regulations**

40 C.F.R. § 52.2540 ...............................................24

**Federal Register**

69 Fed. Reg. 21717 (Apr. 22, 2004) ........................16

81 Fed. Reg. 38957 (June 15, 2016) ........................18

81 Fed. Reg. 59876 (Aug. 31, 2016).........................19

81 Fed. Reg. 74504 (Oct. 26, 2016) .........................17

81 Fed. Reg. 87854 (Dec. 6, 2016),
        *finalized*, 82 Fed. Reg. 9164 (Feb. 3, 2017) ..................13

84 Fed. Reg. 29456 (June 24, 2019),
        *finalized*, 84 Fed. Reg. 56385 (Oct. 22, 2019) ............17

86 Fed. Reg. 31645 (June 15, 2021) ........................17

87 Fed. Reg. 9516 (Feb. 22, 2022) .........................22

88 Fed. Reg. 9336 (Feb. 13, 2023) ....................................*passim*

88 Fed. Reg. 10464 (Feb. 21, 2023) ........................................................18

**Court Rules**

Fed. R. App. P.

     32(a)(5) ...........................................................................................27

     32(a)(6) ...........................................................................................27

     32(a)(7)(B)(ii) ...............................................................................27

     32(f) ................................................................................................27

**Miscellaneous**

Dwyer, John P., *The Practice of Federalism Under the Clean Air Act*,
    54 Md. L. Rev. 1183 (1995) ..........................................................10

U.S. Envt. Protection Agency, *Guidance on the Preparation of Clean Air Act
    Section 179B Demonstrations for Nonattainment Areas Affected by
    International Transport of Emissions*, EPA-457/P-20-001F (Dec. 2020),
    https://www.epa.gov/sites/default/files/2020-01/documents/draft_179b_
    guidance-final_draft_for_posting.pdf ...................................13, 14

Webster's New World Dictionary of American English  (3d coll. ed. 1988) .........13

## **ARGUMENT**

The response brief confirms it: when the Environmental Protection Agency reviewed West Virginia's state implementation plan ("SIP"), it violated the Clean Air Act and the Administrative Procedure Act in at least two distinct ways.

For one thing, the Agency used the wrong legal standard. In arguing otherwise, EPA tries to rewrite history—and the Clean Air Act itself. The Agency starts by obscuring the legal standard that it applied in the Final Disapproval. But the record belies EPA's post-hoc rationalization; in the Final Disapproval, EPA presumed from the beginning that only its approach was the right one. And, in any event, the legal standard that EPA now claims to have used is also improper under the Act. Under the proper standard, EPA should have approved the West Virginia SIP.

For another thing, EPA used data that came too late. That data did not exist when the State created the SIP and was also not even available to the Agency until after its statutory deadline to rule on the SIP. The Agency insists its use of late-breaking modeling data was fine, but its arguments fall short. EPA deviated from a longstanding agency policy without so much as an acknowledgement of the change. Even if it had not broken from prior policy, EPA acted arbitrarily and capriciously. Using data to which the State had no access puts EPA in the SIP driver's seat, contrary to the CAA's structure. And in using data that was not available *even to*

*the Agency* until after its statutory deadline to act on the SIP submittal, EPA considered factors that Congress did not permit the Agency to consider.

The Final Disapproval violated the Act, was arbitrary and capricious under the APA, and should be vacated.

## I.    EPA Reviewed the SIP Under the Wrong Legal Standard.

As the State has explained (Pet'r Br. 29), "there are theoretically at least three standards that the Agency could apply" when reviewing a SIP. The first, and the one EPA in fact applied to the West Virginia SIP, is a presumption against the State and in favor of national uniformity under the Agency's preferred policies. The second, and the one EPA now champions in its brief, is an "independent" review. The third, and the one the Act contemplates, is a reasonableness standard that defers to the States. Only the third respects and carries out the Act's cooperative-federalism regime. The other two either ignore that regime or turn it on its head.

### A.    EPA applied an unlawful presumption against West Virginia's SIP.

1. EPA asserts (Br. 3, 7, 41) that it must "independently" review whether a SIP satisfies the good-neighbor provision. In other words, the Agency must review the SIP de novo, asking from the *Agency's* perspective (without regard to the State's conclusions) whether the plan "prohibit[s] … any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will … contribute significantly to nonattainment in, or interfere with maintenance by, any

2

other State with respect to" the National Ambient Air Quality Standards ("NAAQS"). 42 U.S.C. §7410(a)(2)(D)(i).

But that form of review—which would effectively render every SIP beside the point—is not even what EPA did here. Instead, EPA put a thumb on the scale and required West Virginia to "substantially justif[y]" any "deviation from" an EPA-derived "nationally consistent approach to ozone transport." *E.g.*, 88 Fed. Reg. 9336, 9340 (Feb. 13, 2023) ("Final Disapproval") (JA517). That approach, which set the presumption against which the State was judged, included applying EPA's four-step approach to reach the same substantive conclusions EPA would reach at each step. Pet'r Br. 33-39. This EPA-first standard was not an "independent" analysis for statutory compliance. Instead, in reviewing each State's submissions "with an eye to ensuring national consistency," Final Disapproval, JA558, EPA selected its preferred way to fulfill the statutory criteria and then required States to rebut that desired approach and outcome.

So even if the "independent" review standard that EPA *now* champions is correct, what EPA *actually* did in disapproving West Virginia's SIP is unlawful. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374-75 (1998) (explaining that "applying a … standard of proof which is in fact different from the rule or standard formally announced" does not qualify as "[r]easoned decisionmaking" under the APA). And of course, the Court "may uphold agency

3

action only on the grounds the agency invoked when it took the action." *Williams v. Garland*, 59 F.4th 620, 634 (4th Cir. 2023) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

 2. EPA cannot point to anything that supports the presumption it employed.

 The Agency (joined by *amici*) initially accuses West Virginia of flipping its position from earlier briefing on venue, when the State explained that EPA disapproved the SIP based on "disagreement with State-specific facts and analyses," ECF No. 15 at 19, rather than a "determination of nationwide scope or effect," 42 U.S.C. §7607(b)(1). EPA Br. 3; Br. of Appalachian Mountain Club, et al. as *Amici Curiae* 10-11; Br. of State of New York, et al. as *Amici Curiae* 15.[1] The two positions are not inconsistent (and indeed the State pressed both arguments simultaneously before the motions panel, *see* ECF No. 23-1 at 14-15). And EPA's argument again confuses the standard used with the facts it implicates. Venue turns on the *facts* underlying EPA's action—whether the Agency "assesse[d] and

---

[1] *Amici* also focus on the earlier briefing to urge this Court to reconsider its prior decision denying the Agency's motion to transfer. *See West Virginia v. EPA*, 90 F.4th 323, 331 (4th Cir. 2024). But that published decision cannot be overruled except by the en banc Court, *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc), and this Court already rejected EPA's first attempt to skip ahead to en banc rehearing before the entry of judgment, ECF No. 65. EPA impatiently suggests (Br. 2) this Court take the unusual step of sua sponte en banc rehearing of the venue decision, though the Agency does not explain why that course would be appropriate here (or how such proceedings would affect the yet-decided merits issues). Needless to say, venue need not (and cannot) be relitigated at this stage and, as explained above, West Virginia's position has been consistent.

4

analyze[d] local or regional circumstances"—"not the nature of the applied standard." *West Virginia v. EPA*, 90 F.4th 323, 328, 330 (4th Cir. 2024). It is that *standard* that West Virginia now challenges as an unlawful presumption of uniformity. *See id.* at 329 (finding venue appropriate in this Court regardless of the type of standard applied because "the venue provision of the Clean Air Act does not focus on whether national standards were applied").

On the presumption itself, EPA recharacterizes (Br. 41) its presumption of national uniformity as "consistent review of states' submissions." Of course, agencies must apply the law consistently. *See Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) (calling it a "fundamental norm of administrative procedure" that agencies must "treat like cases alike"). That does not answer the separate question before this Court of *what* law to apply—or, to paraphrase EPA's words, *which* "principles" to "apply[] consistent[ly] … to disparate facts in evaluating states' interstate ozone obligations," EPA Br. 41.

As to those principles, the Agency has precious little to say. It assumes (Br. 41) that the interstate nature of ozone pollution must grant EPA greater regulatory power because "[o]zone presents a regional-scale pollution problem in which multiple states nationwide contribute to unhealthy air in multiple other states." The Supreme Court has made clear, though, that "[n]othing in the Act differentiates the Good Neighbor Provision from the several other matters a State must address in its

SIP," *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509 (2014), and over which the States exercise "primary responsibility," *Mirant Potomac River, LLC v. EPA*, 577 F.3d 223, 227 (4th Cir. 2009) (citation omitted), and have "wide discretion," *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976). In other words, EPA overlooks how Congress made federalism and State discretion one of the driving principles of the Act.

EPA also tries to distance itself from the atextual presumption of national uniformity. *See* EPA Br. 40-41 (assuring that it disapproved the SIP because of "legal and technical flaws," not "merely to pursue the Agency's own national policy preferences"). But here again, EPA is merely trying to change what it said in the Final Disapproval; the presumption is readily apparent from the face of the disapproval. *See Wyoming v. EPA*, 78 F.4th 1171, 1179 (10th Cir. 2023) (concluding that "language in the final rule" shows EPA reviewed a SIP under an improper legal standard in another context); p.3, *supra*. Only "substantial[] justif[ication]" would excuse States from EPA's "uniform framework of policy judgments," Final Disapproval, JA516-JA517, and when numerous States (like West Virginia) failed to muster that level of "justification" EPA imposed the FIP with lightning speed.

As discussed below (pp.7-10), the CAA provides a very different system from—indeed, the opposite of—EPA's presumption of national uniformity. Congress "initially directed" the States to decide how best to fulfill their good-

neighbor obligations. *EME Homer*, 572 U.S. at 514 n.15. "[O]nly after a State has failed to propose a SIP adequate for compliance with the provision is EPA called upon to act." *Id.*; *see also Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975) (explaining that the Act "relegate[s]" EPA "to a secondary role" in the SIP process). The Agency's desire for top-down, nationwide control of States under the good-neighbor provision flouts the Act's system of cooperative federalism and eschews the limited role Congress designed for the Agency.

**B.    EPA's "independent" review standard is incorrect.**

This Court can, and should, vacate and remand simply because the presumption EPA *actually* applied is unlawful. *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). But to ensure the Agency applies the correct standard on remand, this Court should also hold that the "independent" review standard EPA now champions is incorrect.

The Act requires providing "'appropriate deference' to States'" determinations so long as those determinations are "based on reasoned analysis." *Alaska Dep't of Envt. Conservation v. EPA*, 540 U.S. 461, 490-91 (2004) (*ADEC*) (citations omitted); *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013) (deeming *ADEC* "persuasive" and the proper standard of review in a SIP case); *see* Pet'r Br. 30-32 (explaining why *ADEC* provides the appropriate standard). EPA can disapprove a SIP only if, after deferring to the State's reasonable conclusions, the

7

SIP does not meet the criteria specified in the Act and binding regulations. Pet'r Br. 29-32.

EPA argues (Br. 26, 28) that the "plain terms" of Section 7410(k)(3) mandate a deference-free assessment of the SIP. They do not. That provision directs EPA to "approve [a SIP] submittal as a whole if it meets all of the applicable requirements of this chapter." 42 U.S.C. §7410(k)(3). The provision does not speak to the level of deference afforded in that evaluation. *See Kisor v. Wilkie*, 588 U.S. 558, 581 (2019) (plurality) (explaining that the APA's direction that courts "shall … determine the meaning" of an agency rule, 5 U.S.C. §706, "does not specify the standard of review a court should use in 'determining the meaning'" (brackets omitted)). For that same reason, EPA's argument (Br. 28-29) that Section 7410(k)(3)'s "clear statutory language" precludes applying the *ADEC* standard lacks merit as well.

EPA argues that its duty "to ensure that a state plan 'meets all the applicable requirements' of the Act" would be "render[ed] … meaningless" if the Agency "must accept" a SIP "without engaging in a substantive review." Br. 26 (quoting 42 U.S.C. §7410(k)(3)); *see also* EPA Br. 28, 30-32 (citing statutory provisions and caselaw to support "EPA's authority and duty to substantively review state plans"). But no one contests that EPA can engage in substantive review. *ADEC*, 540 U.S. at 495. The question is the proper "scope" of that review. And the answer is that the

8

"'scope' of EPA's 'responsibility' is limited to enforcing the 'minimum compliance' requirements established by the Act." Pet'r Br. 29 (quoting *Union Elec.*, 427 U.S. at 256-57). Then, "[w]ithin that specified scope of review," EPA "must defer to the State's chosen methods." Pet'r Br. 30 (citing *Texas v. EPA*, 829 F.3d 405, 428 (5th Cir. 2016)).

Contrary to EPA's assertion, the State-first approach that Congress required does not reduce the agency to "a box-checking role." EPA Br. 28. EPA can "engag[e] in a substantive review" of a SIP, EPA Br. 26, while deferring to the reasonable conclusions therein, *see Texas*, 829 F.3d at 428. That more cabined form of review is essentially what this Court does in arbitrary-and-capricious or reasonableness review under the APA. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Thus, EPA's warnings (Br. 41-42) of a "game with no referee" where States "could simply assert with little to no rationale that [they] will not significantly contribute to nonattainment or interfere with maintenance" and receive "[u]nquestioning deference" from the Agency are overblown. Any SIP that "assert[s] with little to no rationale that [the State] will not significantly contribute to nonattainment or interfere with maintenance," EPA Br. 42, should indeed be disapproved because it is not "based on reasoned analysis," *ADEC*, 540 U.S. at 490-91. Indeed, EPA approvingly cites two cases applying the *ADEC* standard in which Courts of Appeals upheld EPA's

*disapproval* of a SIP.  Br. 27 (citing *Arizona ex rel. Darwin v. EPA*, 815 F.3d 519, 532 (9th Cir. 2016); *North Dakota*, 730 F.3d at 761); *see Arizona*, 815 F.3d at 537-38; *North Dakota*, 730 F.3d at 766; Pet'r Br 31-32 (listing SIP deficiencies that would justify disapproval).

Moreover, EPA's concern for States run amok would have more purchase if the Agency was the only body with expertise to bear on the issue of air-quality regulation.  But it is not.  *See Virginia v. Browner*, 80 F.3d 869, 883 (4th Cir. 1996) (describing the CAA's "program of cooperative federalism" in which States regulate within "federal minimum standards" (citation omitted)).  The State's own Department of Environmental Protection, Division of Air Quality—staffed with experts in air-quality regulation—prepared the SIP.  And as between federal and local control of in-state emissions, "[t]he knowledge necessary to administer any air pollution control program—to set implementation and enforcement priorities and to plan for future development—can be found *only at the local level*."  Dwyer, *The Practice of Federalism Under the Clean Air Act*, 54 MD. L. REV. 1183, 1218 (1995) (emphasis added).

## C.    Under the correct legal standard, EPA should have approved the West Virginia SIP.

After setting forth the proper legal standard for EPA to apply on remand, this Court need not—and indeed may not—go further.  *Calcutt v. FDIC*, 598 U.S. 623, 629 (2023) (per curiam) ("A 'reviewing court' … is generally not empowered to

conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." (citations omitted)).  This Court can uphold the Agency's disapproval of West Virginia's SIP only on "the grounds upon which the agency acted."  *Chenery*, 318 U.S. at 95.

EPA spends much of its brief finding fault with individual parts of the West Virginia SIP, contending that these criticisms demonstrate that the SIP was "deficient on its own terms."  Br. 33.  Unless and until the Agency evaluates the contents of the SIP under the proper legal standard, though, none of these purported flaws can prop up EPA's legally erroneous approach to SIP review.  *See Chenery*, 318 U.S. at 95.  And under *the proper standard*, EPA should have approved the West Virginia SIP.  Pet'r Br. 39-42.  The criticisms in EPA's brief do not dictate otherwise.

The Agency repeatedly points out (*e.g.*, Br. 32, 33, 34, 39) that West Virginia's Alpine modeling showed that emissions from within the State "contribute" to nonattainment or maintenance receptors.  The question under the good-neighbor provision, though, is not whether there are "contributions"; it is whether those contributions are "significant."  42 U.S.C. §7410(a)(2)(D)(i)(I).

The State concluded based on reasoned analysis that they are not.  Recall that under EPA's four-step approach (that West Virginia opted to follow), Step 1 requires the State to identify downwind receptors projected to have nonattainment or maintenance problems.  In Step 2, West Virginia must determine which upwind

11

States are "linked" to those downwind receptors.  For this assessment, EPA has traditionally used a contribution threshold of 1% of the NAAQS.  At Step 3, West Virginia will identify upwind "cost thresholds" delivering effective emission reductions and downwind air quality improvement.  And in Step 4, West Virginia implements those cost-effect emission reductions in the SIP.  Pet'r Br. 6, 9-12.

West Virginia compared multiple modeling sets to determine the best data at Step 1.  It then conducted a holistic analysis at Step 2 based on several tools, including wind back-trajectories and downwind air quality context, to assess whether the "linkages" identified in the modeling between the State and downwind receptors were accurate.  The results showed that West Virginia did not significantly contribute to any of the identified downwind receptors.  The State therefore could have stopped at Step 2.  But it went on to Step 3 and considered possible additional controls to further reduce downwind emissions.  West Virginia explained that none of those controls were cost-effective based on EPA's own prior analyses.  Pet'r Br. 11-12, 40-42.

EPA caricatures (Br. 37) West Virginia's analysis as incorporating "a but-for causation standard" under which "its own emissions' impact on downwind receptors should be excused because other sources also contribute to the same receptors." West Virginia's position is far more commonsensical: any understanding of the "significan[ce]" of the State's contributions, 42 U.S.C. §7410(a)(2)(D)(i)(I), must

12

be reasonably informed by other factors, including what other emissions are at play and their relative impact. *See Michigan v. EPA*, 213 F.3d 663, 677-79 (D.C. Cir. 2000) (discussing the capaciousness of the word "significant" in the good-neighbor provision and noting EPA's prior acknowledgment that farther-away sources have less impact on downwind receptors); Webster's New World Dictionary of American English 1248 (3d coll. ed. 1988) (defining "significant" in part as "important; momentous"). EPA has recognized as much. 81 Fed. Reg. 87854, 87859-61 (Dec. 6, 2016) (proposed SIP approval) (concluding based on "the total weight of all the evidence" that Nevada's downwind contribution was "insignificant" despite being above 1% of the NAAQS), *finalized*, 82 Fed. Reg. 9164 (Feb. 3, 2017). And when it evaluated those other factors and how they impact the significance of the State's contributions, West Virginia employed appropriate analysis and reached reasonable conclusions. *See* Pet'r Br. 39-42.

EPA also maligns (Br. 39-40) West Virginia's wind back-trajectory analysis, a tool used to determine relative contribution levels. The Agency has itself recognized that these trajectories "promote a fuller understanding of transport between sources and measured concentrations" downwind. EPA, *Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions* 33, EPA-457/P-20-001F (Dec. 2020) (discussing the use of wind back-trajectories to assess whether an area would

13

be in attainment of the NAAQS but for international emissions under 42 U.S.C. § 7509a).[2]   To be sure, such trajectories have certain "limitations," but they nevertheless "can provide useful information as part of the weight-of-evidence." *Id.* at 32; *cf.* EPA Br. 40 (stating that wind back-trajectories are "at most … useful to qualitatively assess whether the linkages identified in the photochemical modeling are corroborated").

West Virginia used this tool in precisely the way EPA had described before— as part of a holistic assessment that included other factors such as distance between monitors, local emissions data, and local mobile sources.  *E.g.*, JA097-JA098; JA215, JA225, JA234; *see also 1000 Friends of Md. v. Browner*, 265 F.3d 216, 234 (4th Cir. 2001) (discussing EPA's recognition that "supplemental analysis, including a 'weight of evidence' analysis" can "demonstrate attainment in cases where the modeling shows ozone levels exceeding the NAAQS").  Though EPA may reach different conclusions based on this data, *see* EPA Br. 40, the State exercised its authority as the primary regulator of emissions within its borders, 42 U.S.C. §7401(a)(3), when it analyzed the evidence before it and provided reasoned analysis to justify its conclusions, *see ADEC*, 540 U.S. at 490-91.

***

---

[2]      https://www.epa.gov/sites/default/files/2020-01/documents/draft_179b_ guidance-final_draft_for_posting.pdf (last visited June 3, 2024).

14

The Agency did not, as it now claims, engage in an "independent" review of the West Virginia SIP. The Final Disapproval plainly states that EPA applied a presumption of national uniformity under which every State had to provide "substantial justification" for any deviation from the Agency's preferred policy and outcome. Final Disapproval, JA517. That extra-statutory presumption is alone sufficient for vacatur and remand.

But in any event, none of EPA's post-hoc arguments hold up. The CAA does not call for "independent" review. Instead, the Act leaves EPA with a "secondary" role in the SIP process, *Train*, 421 U.S. at 79, in which it must defer to States' determinations so long as they are based on reasoned analysis, *ADEC*, 540 U.S. at 490-91; *North Dakota*, 730 F.3d at 761. And West Virginia acted well within those parameters in creating its SIP and reaching the conclusions therein.

## II.    EPA's Use of Post-Submittal Modeling Was Arbitrary and Capricious.

Separate from its use of the wrong legal standard, the Agency's reliance on new modeling data in enforcing that legal standard was arbitrary and capricious for three reasons. First, EPA departed from prior agency practice without acknowledgment or explanation. Second, EPA unfairly moved the approval goalposts. Third, Congress did not authorize EPA to consider data that did not exist until after EPA was statutorily required to act. Pet'r Br. 42-53. EPA has no persuasive answer to any of these arguments, which provide an independent ground

for vacatur and remand (even if this Court were to conclude that EPA properly applied a presumption of national uniformity).

### A. EPA departed from longstanding policy in relying on data that was unavailable to West Virginia while it developed its SIP.

As a threshold matter, this argument is not "waive[d]," EPA Br. 52-53. Multiple comments submitted to the Agency cited *Sierra Club v. EPA*, 356 F.3d 296 (D.C. Cir. 2004) (cited at Pet'r Br. 45-46), which "affirmed EPA's position" that "[e]valuating a plan element based on information that was not available at the time of submittal would create a moving target that would be impossible to meet," 69 Fed. Reg. 21717, 21727 & n.20 (Apr. 22, 2004) (citing *Sierra Club*). *E.g.*, JA393. And in response to comments, EPA refused to acknowledge its departure from prior practice and even sought to distinguish *Sierra Club*. JA393. The Agency plainly had "the opportunity to consider" this argument. *Nat. Res. Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (en banc) (citation omitted).

As to the merits, EPA doubles down (Br. 50) on its position that it hasn't departed from prior practice. First, EPA's distinction of *Sierra Club* is one without a difference. The Agency argues (Br. 50) that *Sierra Club* involved a different type of implementation plan under which rejecting a State's use of old data would require the State to "redo [its] submission using an updated model." The only material difference between that situation and this case is that, rather than force West Virginia to "redo [its] submission using an updated model," EPA Br. 50, EPA stepped in with

16

a FIP. *See* 42 U.S.C. §7410(c)(1)(B). That is no distinction at all when the State wishes to exercise its "primary" authority over emissions within the State. §7401(a)(3). Indeed, the State would have preferred an opportunity to revise and resubmit its SIP. Second, EPA's assertion (Br. 50) that it "did not disapprove any state plan based on choice of modeling" misses the point. West Virginia does not contend that it was penalized for using the Alpine modeling. It objects instead to EPA's heavy reliance on modeling that did not exist when the State submitted its SIP. Pet'r Br. 44-49. That modeling, in EPA's own words, played a "critical role" in the disapproval of the West Virginia SIP. Final Disapproval, JA520.

Finally, EPA's contention (Br. 53) that it was following a different longstanding policy is wrong, too. The agency actions that EPA cites (Br. 53-54) to show a contrary "longstanding policy" are not comparable. The first involved the use of new information to inform a FIP (not a SIP) after remand from the D.C. Circuit. 81 Fed. Reg. 74504, 74504 (Oct. 26, 2016). EPA was therefore no longer grading a State's submission but instead was exercising its role to regulate in the State's stead. *See* 42 U.S.C. §7410(c)(1); *EME Homer*, 572 U.S. at 514 n.15. Several others show EPA considering updated data as simply one additional data point in a holistic analysis based primarily on the data used by the States. 86 Fed. Reg. 31645, 31648-49, 31654 (June 15, 2021); 84 Fed. Reg. 29456, 29461 (June 24, 2019) (proposed rule) ("EPA also conducted modeling of this Area, to inform

17

discussions among EPA and the states regarding this Area.  This modeling used West Virginia's meteorological data but used a different characterization of the stacks …."), *finalized*, 84 Fed. Reg. 56385 (Oct. 22, 2019); 88 Fed. Reg. 10464, 10465 (Feb. 21, 2023).[3]  And in one, EPA disclaimed *in the rule itself* any reliance on updated modeling that the Agency had cited in a recent FIP update.  81 Fed. Reg. 38957, 38959-61 (June 15, 2016) (EPA "did not propose to make a specific finding of contribution or to quantify any specific emissions reduction obligation" based on updated data used for the FIP).  In none of these examples did EPA introduce a new dataset that played "a critical role" in the final agency action, Final Disapproval, JA520, by changing the metrics against which the State would be judged.

The Agency's refusal to "display awareness that it [has] chang[ed] position" is, on its own, arbitrary and capricious.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citation omitted).

> **B.    Even if EPA had not previously had a policy, it was arbitrary and capricious for EPA to move the goalposts during the SIP process.**

EPA argues (Br. 44-45) that agencies generally may not ignore new data, but this ignores EPA's role in the SIP context as reviewer—not creator—of policy.  Pet'r Br. 51-52.  That principle may require the *States* to use the best information available when they create and submit their SIPs, which they do.  *See id.*  But grading States'

---

[3] This last agency action was taken after the Final Disapproval and therefore legally irrelevant to establish EPA's prior policy in any event.

work against criteria that did not exist at the time of submission makes sense only if *EPA* is the primary regulator, which flips the Act's cooperative-federalism regime.

EPA suggests in a parenthetical that this Court's decision in *1000 Friends* endorsed the notion that whether to rely on older or newer modeling is "a question for the EPA to determine."  Br. 47 (quoting 265 F.3d at 230) (emphasis omitted). *1000 Friends* only addressed whether a particular statutory provision required EPA to mandate that a State conduct new photochemical grid modeling, not whether EPA acted arbitrarily and capriciously under the APA by relying on modeling to which the State had no access.  265 F.3d at 230, 234-35.

EPA also relies (Br. 48, 50-51) on the Ninth Circuit's decision in *Sierra Club v. EPA*, 671 F.3d 955 (9th Cir. 2012).  But *Sierra Club* made clear that data *available to a State* at the time of its SIP submission must be considered by EPA.  In that case, California submitted a 2004 SIP then, before EPA ever acted on the submission, provided amendments to the 2004 SIP in 2006 and 2008.  671 F.3d at 961. Meanwhile in 2007, California had submitted a separate SIP (to meet a different CAA requirement), which relied on inventory data that was more recent than that used in the 2004 SIP (including the 2008 amendment).  *Id.* at 963.  The court held that EPA acted arbitrarily and capriciously by approving the 2004 SIP based on the "stale data" without "reconcil[ing] the differences in the emissions data" relied on by the State the year prior to finalizing that SIP.  *Id.*; 81 Fed. Reg. 59876, 59878

19

n.15 (Aug. 31, 2016) (describing the case and stating that "EPA's failure to consider new inventory data submitted by CARB long before the EPA's action on the plan was arbitrary and capricious"). It does not hold that EPA should reject a State's submission based on data that did not exist at the time of that submission.

## C. By relying on modeling data unavailable until after EPA's statutory deadline to act on the West Virginia SIP, the Agency relied on factors Congress did not allow it to consider.

EPA argues (Br. 48) that its statutory deadline "impose[s] no bar on EPA from considering newer data" because "the Supreme Court has consistently declined to treat such deadlines, without more, as precluding later action." But EPA's premise (it may act after the deadline) does not lead to EPA's conclusion (it may base that action on information that did not exist before the deadline). West Virginia does not dispute that the Agency retains authority to disapprove a SIP after this deadline. But the deadline must have some significance. By telling the Agency it may not take more than one year to act on the SIP, 42 U.S.C. §7410(k)(2), Congress cut off the factors that EPA can consider. The statutory deadline necessarily limits the data "Congress … intended [the Agency] to consider" when reviewing States' SIP submissions. *State Farm*, 463 U.S. at 43. By considering evidence outside the statutory time frame, EPA acted arbitrarily and capriciously. *See id.*

*Wisconsin v. EPA* does not hold differently. 938 F.3d 303 (D.C. Cir. 2019) (per curiam). As the State has explained (Br. 49), the *Wisconsin* court held that EPA

20

could use projected data to determine future nonattainment status. The case says nothing, however, of EPA's claimed authority to use post-hoc modeling to disapprove a SIP. *See* 938 F.3d at 321-22.

EPA next contends (Br. 49) that precluding consideration of later modeling would yield "absurd results." But the alleged absurdity arises only if one ignores all the other mechanisms available to EPA, upwind States, and downwind States to cause the Agency to reconsider the sufficiency of a SIP based on new information. *See* 42 U.S.C. §§7410(k)(5) (SIP call), (*l*) (plan revisions), 7426(b) (petition from a downwind jurisdiction).[4] Moreover, at least in this case, the discrepancies between the modeling available to the State at the time of submission and the modeling used by EPA at the time of review are due to EPA's own delay. *See* Pet'r Br. 50. EPA "may not use its own delay as an excuse for imposing burdens on [West Virginia] that" the Act "does not permit." *Texas*, 829 F.3d at 430.

### D.    The Change in Modeling Was Not Harmless.

The Agency's shell game cannot be dismissed as "harmless error," EPA Br. 43. An agency error is harmless only if it "clearly had no bearing on the procedure

---

[4] *Amici* Appalachian Mountain Club, et al. argue (Br. 18) that relying on SIP calls would require EPA to approve SIPs "that EPA knows fail to satisfy statutory requirements" based on updated data. That argument assumes that the updated data is a basis for finding that the SIP does not satisfy the Act's requirements—the very question at issue here. *Amici* then predict (Br. 18) that EPA would be required to approve any revised SIP with "novel justifications for refusing to reduce pollution" with no explanation why that would be so.

used or the substance of [the] decision reached." *Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004) (quoting *Massachusetts Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964)). Showing "prejudicial error" is "not a particularly onerous requirement." *Sea "B" Min. Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016) (citation and ellipsis omitted).

Each new iteration of modeling materially changed the list of receptors to which West Virginia was linked. Half of the linked receptors identified in the Version 2 modeling were not identified in the initial modeling, and none of them were identified in the Alpine modeling. Pet'r Br. 13. The Version 3 modeling linked the State to a third set of four receptors, half of which had not been identified in any prior modeling (either EPA's or Alpine's). Pet'r Br. 16. Beyond these objective changes in data, EPA treated each new modeling as important to the "procedure" and "substance" of its decisions. *Ngarurih*, 371 F.3d at 190 n.8 (citation omitted). The Agency "*primarily* rel[ied] upon the [Version 2] modeling … to inform its [proposed] decision," 87 Fed. Reg. 9516, 9525-26 (Feb. 22, 2022) (JA315-JA316) (emphasis added), and the Version 3 modeling played "a *critical* role" in its final decision, JA520 (emphasis added). There is no serious argument that EPA's reliance on the updated modeling "clearly had no bearing on the procedure used or the substance of [the] decision reached." *Massachusetts Trs.*, 377 U.S. at 248.

22

## III.   This Court Should Vacate the SIP Disapproval.

EPA does not respond to the State's arguments (Pet'r Br. 53-55) that remand without vacatur contravenes the APA.[5]  When Congress stated that a "reviewing court *shall* … hold unlawful and set aside agency action … found to be" arbitrary and capricious or in excess of statutory jurisdiction, it meant what it said.  5 U.S.C. §706(2) (emphasis added); *Comcast Corp. v. FCC*, 579 F.3d 1, 10 (D.C. Cir. 2009) (Randolph, J., concurring).

But even if this Court were to adopt the D.C. Circuit's view that remand without vacatur is lawful under the APA, that "exceptional remedy" would not be appropriate here.  *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020) (*AGLPA*) (considering the seriousness of the action's deficiencies and the likely disruptive consequences of vacatur when weighing whether to remand without vacatur).

First, the Final Disapproval's deficiencies go to the very heart of the Act.  *See id.*  West Virginia does not "primarily allege[] procedural defects and record-based

---

[5] *Amici* Appalachian Mountain Club, et al. cite (Br. 28-29) several cases that "have remanded agency action without vacatur and therefore" in their view "have validated courts' power to employ that remedy."  None of those decisions, however, provide any explanation why this remedy is permissible given the plain text of the APA; they merely rely on the fact that some courts have taken this approach.  *See, e.g.*, *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) (adopting the D.C. Circuit's approach without explanation); *Sierra Club v. EPA*, 60 F.4th 1008, 1022 (6th Cir. 2023) (same).

errors." EPA Br. 57.  The Agency analyzed the West Virginia SIP under an incorrect legal standard that turned the Act's cooperative-federalism scheme upside down. And the constant shifting of modeling data further undercuts the carefully prescribed SIP-review process in which States play the "primary" role as regulators of emissions within their borders.  Pet'r Br. 55.

Second, vacating disapproval of the West Virginia SIP would not pose unduly disruptive consequences.  *See AGLPA*, 962 F.3d at 518.  As the State pointed out (Pet'r Br. 55-56), the disapproval is already stayed and so vacatur would not alter the status quo.  *West Virginia*, 90 F.4th at 332.  And the State will continue to limit downwind emissions by enforcing existing regulations governing West Virginia emissions, including EPA's own FIP.  *See* 40 C.F.R. §52.2540.  EPA worries (Br. 57) that "[w]ithout the Disapproval [of the West Virginia SIP], EPA would lack the authority to implement the Good Neighbor Plan for West Virginia."  But that concession militates *in favor of* vacatur, not *against* it.  "[O]nly after a State has failed to propose a SIP adequate for compliance with the [good-neighbor] provision is EPA called upon to act."  *EME Homer*, 572 U.S. at 514 n.15.  Moreover, EPA's own years-long delay in meeting its "statutory schedule," EPA Br. 57; *see* EPA Br. 10; Pet'r Br. 12-15, is not a basis for keeping its unlawful order in place.

## <u>CONCLUSION</u>

For the foregoing reasons and those in Petitioner's opening brief, this Court should grant the petition for review and vacate the West Virginia SIP disapproval.

Dated: June 3, 2024                     Respectfully submitted,
                                        /s/ Elbert Lin


PATRICK MORRISEY                        LINDSAY S. SEE
*Attorney General*                      *Solicitor General*
                                        *Counsel of Record*
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL                        MICHAEL R. WILLIAMS
1900 Kanawha Blvd., East                *Principal Deputy Solicitor General*
Building 1, Room E-26
Charleston, WV 25305                    *Counsel for Petitioner State of West*
Phone: (304) 558-2021                   *Virginia*
lindsay.s.see@wvago.gov
                                        Elbert Lin
                                        Kevin S. Elliker
                                        David N. Goldman
                                        HUNTON ANDREWS KURTH LLP
                                        951 East Byrd Street, East Tower
                                        Richmond, VA  23219
                                        (804) 788-8200
                                        elin@HuntonAK.com
                                        kelliker@HuntonAK.com
                                        dgoldman@HuntonAK.com

                                        E. Carter Chandler Clements
                                        HUNTON ANDREWS KURTH LLP
                                        2200 Pennsylvania Avenue, N.W.
                                        Washington, DC  20037
                                        (202) 955-1500
                                        eclements@HuntonAK.com

                                        *Special Assistant Attorneys General*

25

*Counsel for Petitioner*
*State of West Virginia*

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,041 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman font, using Microsoft Word.

/s/ Elbert Lin
Elbert Lin

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 3d day of June, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system, which shall send notification of such filing to all CM/ECF participants.

/s/ Elbert Lin
Elbert Lin

27